Opinion by Justice Burgess
After a jury found Deborah Smiley McFadden guilty of murdering her live-in boyfriend, Edward Eugene George, Jr., (George), the trial court sentenced her to forty years' confinement in prison. McFadden has appealed, maintaining (1) that there was insufficient evidence to support the jury's verdict of guilt and (2) that the trial court erred when it denied McFadden's request for a jury instruction on defense of property. While we find there was sufficient evidence to support the jury's verdict of guilt, we also find that the trial court erred in failing to instruct the jury on the use of deadly force in defense of property under Section 9.42 of the Texas Penal Code. Accordingly, we reverse the trial court's judgment and remand the case to the trial court for a new trial.
I. Background
Vernetta Morgan arrived at her home around noon on October 12, 2003, and noticed McFadden's vehicle[1] parked behind a shed on the property. Morgan looked inside one of the vehicle's windows and saw McFadden sleeping in the back seat. McFadden informed Morgan that she and George had been in an argument and that *281 McFadden was moving out of George's home. Morgan agreed to help McFadden move her belongings from George's home.
Morgan and McFadden travelled to George's house and asked George if they could retrieve McFadden's belongings. Initially, George refused. McFadden and George then began "arguing back and forth,"[2] so Morgan contacted the sheriff's department to ask an officer to come to the home to assist them in retrieving McFadden's property. According to Morgan, there were no officers available due to an earlier emergency call.
Morgan then asked George if they "could please just get [McFadden's] clothes, and George responded, "You can take her clothes, but you are not taking anything else." Morgan and McFadden began carrying boxes of clothes out to McFadden's SUV. At one point, Morgan and George drank beer together while McFadden continued to pack her belongings. Morgan stated, "I was drinking a beer with [George], just kind of keeping things light because it was-it just was a heated moment." According to Morgan, McFadden "seemed fairly relaxed," but George was "complaining" and "yelling." Morgan denied that McFadden seemed fearful, stating, "No. She just kept loading stuff." She further testified that, at one point, "[McFadden] was lounged out on the couch."
Morgan explained that, while McFadden remained inside the house and continued packing, she went back outside. Shortly thereafter, George came outside with a cigarette lighter and stated that "he was going to light the boxes in the Yukon on fire because [McFadden] would not come out of the house." According to Morgan,
He tried to light one of the boxes, and it wouldn't light. So he ran over to a carport and grabbed a gas can and started pouring it-excuse me-in the Yukon on her stuff. And I asked him, "Please don't do this. Just let us get this done, and we'll be out of here."
After pouring gasoline on the boxes, George went back inside the house in order to get McFadden to come outside "because he wanted her to see that he was going to do it. He was going to light the boxes." At that point, Morgan heard McFadden and George yelling at one another. Although she did not want to get involved, Morgan heard McFadden yelling for help, and Morgan ran inside the house. She found McFadden in the hallway with George "hovering over her." According to Morgan, George hit McFadden in the cheek and then kicked her in her ribs. Morgan helped McFadden up and then helped her get out of the house. McFadden went to the driver's side of her vehicle, and George followed them out. Morgan went to *282 the back of the vehicle because "there was another box. [Morgan] was going to put it in, shut the Yukon, get in and go."
Before she could load the box into the Yukon and shut the rear door, Morgan heard a "pop-pop." At one point in her testimony, Morgan said, "[George came] running around me. I believe he brushed by and grabbed my arm." According to Morgan, George was in front and McFadden was following behind him with the gun in her hand. Morgan stated, "Oh, my God, Debbie. Stop. And I believe she shot one more time."[3] Morgan then heard George fall down behind her. She stated he was on the ground by the passenger-side rear tire. Morgan told McFadden, "You just shot him."[4]
Morgan called 9-1-1 and told the operator, "[My] girlfriend ... just shot her boyfriend." After Morgan finished the 9-1-1 call,[5] she saw McFadden standing at the edge of the driveway with the gun in her hand. McFadden asked her if George was "still breathing." Shortly after the incident, George's son, David George (David) arrived and began attending to George. Morgan also tried to help George, but McFadden did not attempt to assist him in any way. According to Morgan, after the incident, McFadden asked her to "help her [and] say it was self-defense."
Kenneth Edgmon, formerly a K-9 officer with the Panola County Sheriff's Office, arrived at George's home on October 12, 2003. According to Edgmon, emergency medical personnel were already there "working on the person on the ground," and Morgan and McFadden were standing in the driveway. McFadden admitted to Edgmon that she had shot George. McFadden also told him that the gun was in her vehicle. Edgmon found the weapon in McFadden's vehicle in "a pocket on the back of the driver's seat, and it was sticking out of it." Edgmon removed the weapon from the vehicle, finding a nine-shot, fully-loaded revolver containing six spent shell casings and three live rounds. Edgmon did not know how many times the weapon had been fired that day, but it could have been fired up to six times based on the fact that there were six spent shell casings found in the revolver.
David Allen Gray, a former criminal investigator with the Panola County Sheriff's Office, took photographs and video recordings of the scene, both of which were admitted into evidence. While he was at the scene, Gray smelled a "strong odor of gasoline" around McFadden's vehicle and on the boxes containing her belongings.[6] A five-gallon gasoline can was found just outside the garage door. Gray believed there was fuel remaining in the gas can, but he could not recall the amount.
Sarah Fields, a lieutenant in the Criminal Investigative Division of the Panola County Sheriff's Office, took photographs of McFadden's injuries, which included (1) a small laceration to McFadden's lip, (2) a discolored area around her ribs, (3) bruising to her knee and thigh, (4) bruising to her lower abdomen, (5) scratches to the *283 neck, (6) an abrasion to her ear, and (7) some type of wound to her hand.[7] Fields stated that McFadden's injuries appeared to be from an assault and that her investigation led her to conclude that George had been the assailant.
Snoot McGuire, a former Panola County constable, testified that he was familiar with George and that he knew of instances when George had been involved in violent altercations. McGuire stated that he "knew [George] beat his wife one time." He continued, "I don't know what date it was." When asked if George was a "man of peace, a man of violence, a man of calmness," McGuire responded, "He could be both whenever he wanted to."[8]
II. Discussion
A. Sufficiency of the Evidence
1. Standard of Review
In evaluating legal sufficiency in this case, we must review all the evidence in the light most favorable to the jury's verdict to determine whether any rational jury could have found, beyond a reasonable doubt, that McFadden was guilty of the offense of murder. See Brooks v. State , 323 S.W.3d 893, 912 (Tex. Crim. App. 2010) (plurality op.) (citing Jackson v. Virginia , 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) ); Hartsfield v. State , 305 S.W.3d 859, 863 (Tex. App.-Texarkana 2010, pet. ref'd) (citing Clayton v. State , 235 S.W.3d 772, 778 (Tex. Crim. App. 2007) ). Our rigorous legal sufficiency review focuses on the quality of the evidence presented. Brooks , 323 S.W.3d at 917-18 (Cochran, J., concurring). We examine legal sufficiency under the direction of the Brooks opinion, while giving deference to the responsibility of the jury "to fairly resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." Hooper v. State , 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (citing Jackson , 443 U.S. at 318-19, 99 S.Ct. 2781 ). We afford almost total deference to a jury's credibility determinations. Lancon v. State , 253 S.W.3d 699, 705 (Tex. Crim. App. 2008). An appellate court may not re-evaluate the weight and the credibility of the evidence or substitute its judgment for that of the fact-finder. Williams v. State , 235 S.W.3d 742, 750 (Tex. Crim. App. 2007).
Further, circumstantial evidence is as probative as direct evidence, and it can be sufficient alone in establishing guilt. Sorrells v. State , 343 S.W.3d 152, 155 (Tex. Crim. App. 2011) ; Clayton v. State , 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). "Each fact need not point directly and independently to the guilt of the appellant, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction." Hooper , 214 S.W.3d at 13. "Evidence is legally insufficient when the 'only proper verdict' is acquittal." Nelson v. State , 405 S.W.3d 113, 122 (Tex. App.-Houston [1st Dist.] 2013, pet. ref'd) (quoting Tibbs v. Florida , 457 U.S. 31, 41-42, 102 S.Ct. 2211, 72 L.Ed.2d 652 (1982) ).
*284 Legal sufficiency of the evidence is measured by the elements of the offense as defined by a hypothetically correct jury charge. Malik v. State , 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). The hypothetically correct jury charge "sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried." Id.
2. Analysis
Here, the State charged McFadden with the offense of murder.[9] The State's indictment against McFadden alleged that,
on or about the 12th day of October, 2003, and before the presentment of this Indictment, in the County and State aforesaid, [McFadden] did then and there with intent to cause serious bodily injury to Edward Eugene George, Jr., commit an act clearly dangerous to human life that caused the death of said Edward Eugene George, Jr.[,] by shooting him with a pistol[.]
McGuire asserts that no rational jury could have rejected her self-defense claim, nor could they have concluded that her actions were not justified.
A jury's ultimate conclusion must be rational in light of all the evidence. Jackson v. Virginia , 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). In reviewing the sufficiency of the evidence, when a jury has rejected the claim of self-defense, an appellate court must "determine whether [,] after viewing all the evidence in the light most favorable to the prosecution, any rational trier of fact would have found the essential elements of murder beyond a reasonable doubt and also would have found against appellant on the self-defense issue beyond a reasonable doubt." Saxton v. State , 804 S.W.2d 910, 914 (Tex. Crim. App. 1991). A claim of self-defense may be raised as a justification for an accused's actions. TEX. PENAL CODE ANN. § 9.02 (West 2011). "[A] person is justified in using force against another when and to the degree the actor reasonably believes the force is immediately necessary to protect the actor against the other's use or attempted use of unlawful force." TEX. PENAL CODE ANN. § 9.31(a) (West 2011). Further, "[a] person is justified in using deadly force against another ... when and to the degree the actor reasonably believes the deadly force is immediately necessary ... to protect the actor against the other's use or attempted use of unlawful deadly force." TEX. PENAL CODE ANN. § 9.32(a) (West 2011).
In raising the justification of self-defense, a defendant bears the burden of production, which requires the production of some evidence that supports the particular justification. Zuliani v. State , 97 S.W.3d 589, 594 (Tex. Crim. App. 2003). Once a defendant produces such evidence, the State bears the burden of persuasion to disprove the raised defense beyond a reasonable doubt. Id. The burden of persuasion does not require the production of evidence, but rather only requires that the State persuade the jury beyond a reasonable doubt that the defendant did not act in self-defense. Id. A jury verdict of guilt results in an implicit finding against the defensive theory. Id.
McFadden complains that the jury's rejection of her self-defense claim is unsupported *285 by the evidence because the evidence did not show that George was running away from her. She contends the evidence showed that George was shot in the face, which, presumably, would lead a reasonable fact-finder to believe George was the aggressor, thereby justifying her need to defend herself. The State contends the evidence is sufficient to support the jury's guilty verdict because the evidence demonstrated that McFadden had been given several opportunities to leave George's home "but[,] instead[,] chased after ... George ... and shot him dead."
While McFadden asserted that George was shot "in the face," the evidence shows that George was shot on the left side of his check and that the bullet's trajectory was "left to right, front to back, and upward." Although the evidence is not clear as to the exact moment McFadden fired the gun, the jury could reasonably have inferred from the findings of the autopsy report that McFadden shot George as he was looking over his shoulder, or as he was walking or running around the right side of the rear portion of the vehicle. This inference would be consistent with Morgan's testimony that George came running around the rear of the vehicle and that George was in front and McFadden was following behind him with the gun in her hand.
In addition, McFadden contends that the autopsy report's findings were "consistent with a drunken angry George towering over [McFadden] as they struggled in the altercation at the driver's side door of the Yukon." Although there is evidence that George physically assaulted McFadden while they were inside the house, there is no evidence that George used or attempted to use unlawful deadly force against McFadden at the time of the shooting.[10] Thus, McFadden's assertion is without merit.
Moreover, when there is evidence, if believed, to support a claim of self-defense, but other evidence, if believed, to support a conviction, an appellate court will not weigh in on this fact-specific determination as this is a function of a properly instructed jury. Reeves v. State , 420 S.W.3d 812, 820 (Tex. Crim. App. 2013). In this case, a rationale trier of fact could have determined that McFadden was not acting in self-defense but, instead, intentionally shot George without justification, thereby causing his death. We, therefore, find that the evidence was legally sufficient to support the trial court's judgment of conviction.
We overrule McFadden's first point of error.
B. The Trial Court Erred in Failing to Give An Instruction on the Use of Deadly Force in Defense of Property
1. Introduction and Standard of Review
During trial, McFadden submitted to the court a proposed jury instruction regarding the use of deadly force in defense *286 of property.[11] The trial court denied McFadden's request, and the jury was not charged on the law of defense of property. McFadden contends that the trial court reversibly erred when it refused to include the tendered instruction.
A trial court is required to charge the jury on any defensive issue raised by the evidence, "regardless of its substantive character." Brown v. State , 955 S.W.2d 276, 279 (Tex. Crim. App. 1997). An accused is entitled to an affirmative defensive instruction on every issue raised by the evidence regardless of whether it is strong, weak, unimpeached, or contradicted, and even when the trial court is of the opinion that the testimony in not credible. Id. It is within the jury's purview to decide whether to accept or reject a properly raised defensive theory. Woodfox v. State , 742 S.W.2d 408, 410 (Tex. Crim. App. 1987). McFadden contends that the trial court erred in failing to include an instruction on the defense of property because the evidence showed that McFadden reasonably believed that deadly force was immediately necessary to prevent George from committing arson when he poured gasoline around McFadden's vehicle and on her personal property.
Section 9.42 of the Texas Penal Code states,
A person is justified in using deadly force against another to protect land or tangible, movable property:
(1) if he would be justified in using force against the other under Section 9.41;[12 ] and
(2) when and to the degree he reasonably believes the deadly force is immediately necessary:
*287 (A) to prevent the other's imminent commission of arson, burglary, robbery, aggravated robbery, theft during the nighttime, or criminal mischief during the nighttime; or
(B) to prevent the other who is fleeing immediately after committing burglary, robbery, aggravated robbery, or theft during the nighttime from escaping with the property; and
(3) he reasonably believes that:
(A) the land or property cannot be protected or recovered by any other means; or
(B) the use of force other than deadly force to protect or recover the land or property would expose the actor or another to a substantial risk of death or serious bodily injury.
TEX. PENAL CODE ANN. § 9.42 (West 2011). All three of Section 9.42's statutory circumstances must exist in order for an individual to be justified in employing deadly force against another to protect property. Leach v. State , 983 S.W.2d 45, 47 (Tex. App.-Tyler 1998, no pet.).
2. Analysis
McFadden points out that Section 9.42(2)(A) allows a person to use deadly force to protect property in response to another person committing arson. Resolution of this issue first turns on whether there is any evidence that McFadden reasonably believed that deadly force was immediately necessary to stop George from committing arson.[13] If so, then we must determine whether there is some evidence that McFadden reasonably believed that her property could not be protected by any other means.
a. Was There Some Evidence that McFadden Reasonably Believed that the Use of Deadly Force Was Immediately Necessary to Prevent George from Committing Arson?
The clear intent behind Section 9.42's defense of property is to permit persons to use deadly force to prevent the actor from committing arson in specific, prescribed instances. In other words, a person does not have to wait for the actor to complete the offense before using deadly force. Indeed, if deadly force could only be used after the actor committed the offense, the defense would never apply. Therefore, the issue of whether McFadden had a reasonable belief that deadly force was immediately necessary to stop George from committing arson is different from the issue of whether the evidence was sufficient to convict George of arson. While there is some overlap between the two concepts, a reasonable belief that deadly force is necessary to prevent the actor from committing the offense of arson can be developed on facts which would be insufficient to prosecute the actor for arson. Accordingly, for the defense to apply, the evidence need show only that the defendant had a reasonable belief that the use of deadly force was immediately necessary to prevent the actor from committing arson.
*288 We begin this analysis by considering the elements of the offense of arson. "A person commits [arson] if the person starts a fire, regardless of whether the fire continues after ignition, or causes an explosion with the intent to destroy or damage: (1) any vegetation, fence, or structure on open-space land; or (2) any building, habitation, or vehicle...." TEX. PENAL CODE ANN. § 28.02(a)(1), (2) (West 2011). Thus, the offense of arson is committed only when the defendant intends to destroy statutorily defined property. In this case, the only property which could support the offense of arson is McFadden's vehicle.
Although Morgan, in her witness statement, testified, "[George] was slinging the [gas] can around as he poured [it] on the boxes [and] got gas on me," the evidence primarily shows that George intended to set fire to McFadden's personal property inside the vehicle, not the vehicle itself. For instance, Morgan testified that, when George went outside with the lighter, he stated that "he was going to light the boxes in the Yukon on fire because [McFadden] would not come out of the house." (Emphasis added). According to Morgan, "[George] tried to light one of the boxes , and it wouldn't light. So he ran over to a carport and grabbed a gas can and started pouring it ... in the Yukon on her stuff. " (Emphasis added). Morgan continued by stating that "[George] was going to light the boxes " and that "he wanted [McFadden] to see that he was doing it." (Emphasis added).
Moreover, Morgan's October, 12, 2003, written statement corresponds with her testimony at trial. Morgan wrote, "[George] then said if she didn't bring back his wallet it would be the biggest damn bonfire you had ever seen. He then said she had until midnight tomorrow night that he was going to pour gas on her stuff then burn it." Accordingly, the question before us is whether there is any evidence from which a jury could find that McFadden reasonably believed that George intended to set fire to McFadden's vehicle when he set fire to McFadden's property inside the vehicle.[14]
As noted above, the defense under Section 9.42 allows the use of deadly force when immediately necessary to prevent the commission of arson. Even if the jury did not find that the gasoline spread beyond the boxes when he was "slinging the can around as he poured [it] on the boxes [and] got gas on [Morgan]," it is commonly known that gasoline is a highly flammable-and even explosive-substance. Therefore, lighting the boxes inside the vehicle could easily have spread fire to the vehicle itself. On these facts, McFadden was not required to wait and see whether the fire would spread from the boxes to the surrounding vehicle before determining that deadly force was immediately necessary to prevent George from committing arson. Rather, both McFadden and the jury could have reasonably inferred that, if he had set fire to the gasoline-covered boxes, George would also have been setting fire to the vehicle containing them. Accordingly, there is some evidence in the record from which a jury could have found that deadly force was immediately necessary *289 to prevent George from committing arson.[15]
However, merely showing that deadly force was immediately necessary in the abstract is one thing; there must also be some evidence showing that McFadden reasonably believed it was immediately necessary. The record shows that, during at least part of the time George was attempting to light the boxes, McFadden was inside the house. Even if the facts were sufficient to show that use of deadly force was immediately necessary, McFadden cannot show that she reasonably believed it was immediately necessary if she did not know what George was doing to the boxes inside her car. Thus, the next question is whether there is any evidence that McFadden knew that George had poured gasoline on the boxes and was attempting to light them.
Morgan testified that, after George poured gasoline on the boxes inside the vehicle, "he went in to get her because he wanted her to see that he was going to do it. He was going to light the boxes." Morgan then heard yelling back and forth inside the residence. Then she heard McFadden calling for help. In addition, Gray testified that, when he arrived at the scene shortly after the shooting, he smelled a "strong odor of gasoline" around McFadden's vehicle and on the boxes containing her belongings. And a green cigarette lighter was found on the ground where George fell after he was shot. A jury could infer from this testimony that George did as he threatened: he told *290 McFadden that he was going to set fire to the boxes inside her vehicle.
As the Court of Criminal Appeals has held, "A defendant is entitled to an affirmative defensive instruction on every issue raised by the evidence regardless of whether it is strong, feeble, unimpeached, or contradicted, and even if the trial court is of the opinion that the testimony is not entitled to belief." Williams v. State , 630 S.W.2d 640, 643 (Tex. Crim. App. 1982) (quoting Warren v. State , 565 S.W.2d 931, 933-34 (Tex. Crim. App. [Panel Op.] 1978) (citations omitted)); see also Brown , 955 S.W.2d at 279. In making this determination, "the courts are not concerned with the source, truth, or probative force of that testimony, but are concerned only if there be testimony raising the issue." Witty v. State , 150 Tex.Crim. 555, 203 S.W.2d 212, 219 (1947). "This rule is designed to insure that the jury, not the judge, will decide the relative credibility of the evidence." Granger v. State , 3 S.W.3d 36, 38 (Tex. Crim. App. 1999). And, "[i]n determining whether a defense is thus supported, a court must rely on its own judgment, formed in the light of its own common sense and experience, as to the limits of rational inference from facts proven." Shaw v. State , 243 S.W.3d 647, 658 (Tex. Crim. App. 2007). Finally, "[t]he law of self-defense and defense of property requires the jury to view the reasonableness of the defendant's actions solely from the defendant's standpoint." Ex parte Drinkert , 821 S.W.2d 953, 955 (Tex. Crim. App. 1991).
In view of this liberal standard, and on the record in this case, there is some evidence from which a jury could have found that McFadden reasonably believed the use of deadly force was immediately necessary to prevent George from committing arson.
b. Did McFadden Reasonably Believe that the Property Could Not Have Been Protected by Any Other Means?
Section 9.42(3) also requires some evidence from which the jury could find that McFadden "reasonably believe[d] that: (A) the land or property [could not have been] protected or recovered by any other means." TEX. PENAL CODE ANN. § 9.42(3). Of course, it is not required that there be some evidence excluding "other [theoretical] means," but, instead, there need only be some evidence in the record excluding "other [available] means."
One possible "other [available] means" would have been for McFadden to drive away with the gasoline-covered boxes inside the vehicle. See Trammell v. State , 287 S.W.3d 336, 341 (Tex. App.-Fort Worth 2009, no pet.) ("[E]ven if appellant thought that Enzifer intended to cause such harm, appellant could have simply driven away from the scene; shooting the gun was not an immediately necessary response."). Yet, the testimony established that, at the time McFadden was shooting at George, the vehicle's doors were open and Morgan was loading a box into the back of the vehicle. Therefore, unlike Trammell , where the defendant was sitting inside his car and shot the victim as he approached in a different car, McFadden was not in her car, her car was not running, and the doors were still open. See ids="7301320" index="43" url="https://cite.case.law/sw3d/287/336/#p341">id. at 337-38.
Moreover, McFadden had just been physically assaulted by George immediately prior to the time he followed McFadden to the vehicle. Having followed her to the vehicle containing the gasoline-covered boxes that he had just threatened to light and immediately after physically assaulting McFadden-and in light of the liberal standard applicable to review of a trial court's failure to submit requested jury *291 instructions-there is some evidence that McFadden "reasonably believe[d] that ... the ... property [could not have been protected] ... by any other means." TEX. PENAL CODE ANN. § 9.42(3). Accordingly, in view of the standard of review applicable to this question, we find that the trial court erred in refusing to give the instruction on the use of deadly force in defense of property.
C. Was the Trial Court's Error Harmful?
1. Standard of Review
The Court of Criminal Appeals has held that the failure to give a requested instruction on self-defense is not automatically reversible, but must be evaluated for harmless error. Reich-Bacot v. State , 936 S.W.2d 961, 962 (Tex. Crim. App. 1996) (per curiam). When charge error is properly objected to,
reversal is required if the error is "calculated to injure the rights of defendant," which means no more than that there must be some harm to the accused from the error. In other words, an error which has been properly preserved by objection will call for reversal as long as the error is not harmless.
Almanza v. State , 686 S.W.2d 157, 171 (Tex. Crim. App. 1984). To make this determination, "the actual degree of harm must be assayed in light of the entire jury charge, the state of the evidence, including the contested issues and weight of probative evidence, the argument of counsel and any other relevant information revealed by the record of the trial as a whole." Id.
On the other hand, in their treatise, Professors Dix and Schmolesky argue that, based on reasoning in a recent Court of Criminal Appeals opinion, a specialized harm analysis is necessary for confession and avoidance defenses:
Because a defendant is required to admit commission of the crime to be entitled to a confession and avoidance type of defense, the erroneous refusal of a trial court to instruct the jury concerning such a defense when appropriate has been held to constitute automatic reversible error because the denial of an instruction precludes the only path to acquittal in light of the required admission of guilt if not for the defense.
43 George E. Dix, et al., Texas Practice Series: Criminal Practice & Procedure § 43.30 (2016-2017 ed.). The authors cite to Villa v. State in support of their conclusion. Id. (citing Villa v. State , 417 S.W.3d 455 (Tex. Crim. App. 2014) ).
In Villa , the Court of Criminal Appeals held that an attorney's failure to request a medical care defense instruction in a child sexual assault case was prejudicial under the heightened standard of review for ineffective assistance of counsel claims without conducting a harm analysis. Villa v. State , 417 S.W.3d 455 (Tex. Crim. App. 2014). Professors Dix and Schmolesky conclude that "the failure of counsel to request a jury instruction on the one remaining path to acquittal, the confession and avoidance defense of a medical examination in child sexual assault case, required reversal." 43 George E. Dix, et al., Texas Practice Series: Criminal Practice & Procedure § 43.30 n.5.85 (2016-2017 ed.). Because the harm required to establish prejudice for an ineffective assistance of counsel claim (a probability of a different outcome) is higher than the "some harm" standard for preserved jury charge error under Almanza , the authors argue that the finding of prejudice in Villa necessitates a per se harm finding in cases where the trial court failed to instruct on a confession-and-avoidance defense.
It is clear that "[a] section 9.42 defense of property instruction is, on its face, a confession-and-avoidance or 'justification' type of defense."
*292 Rodriguez v. State , 392 S.W.3d 859, 860 (Tex. App.-Amarillo 2013, no pet.). And, there is no question that McFadden confessed to shooting George. In his opening statement, defense counsel stated, "Deborah McFadden fired that gun, and that gun struck Mr. George in the cheek.... There's not a question that Deborah McFadden shot E.E. George." Under Professors Dix' and Schmolesky's reasoning, harm would be automatic in this case.
Yet, though their reasoning is sound, Villa was not a charge-error case, and it did not reference Reich-Bacot . Accordingly, it does not appear that the holding in Villa expressly negates the holding in Reich-Bacot . As an intermediate appellate court, we are bound to follow the Court of Criminal Appeals' latest ruling on this issue, which is Reich-Bacot . Nevertheless, while it does not make harm automatic, the fact that "the denial of an instruction precludes the only path to acquittal in light of the required admission of guilt if not for the defense" is a factor to consider in light of the entire record in determining whether the defendant sustained some harm.[16] 43 George E. Dix, et al., Texas Practice Series: Criminal Practice & Procedure § 43.30 (2016-2017 ed.).
2. Analysis
a. Did the Jury's Verdict Also Negate McFadden's Reasonable Belief that Deadly Force Was Immediately Necessary to Prevent George From Committing Arson?
Because the jury rejected McFadden's self-defense claim, we must first determine whether the jury's verdict also negated her defense of property claim. In Wooten v. State , the Court of Criminal Appeals held that the jury's verdict rejecting the appellant's self-defense claim negated his sudden-passion defense as well. Wooten v. State , 400 S.W.3d 601, 609-10 (Tex. Crim. App. 2013). The Court of Criminal Appeals reasoned that "the jury's rejection of the appellant's self-defense claim demonstrates that the jury simply did not believe his claim that he reasonably believed deadly force was immediately necessary." Id. at 609. It went on to say,
[A] jury that had already discredited the appellant's claim that he reasonably believed deadly force to be immediately necessary would be unlikely to believe that, at the time the appellant fired first, he was actually experiencing a level of fear that caused him to lose control. Moreover, even had the jury believed that the appellant subjectively experienced such a level of fear, it would not likely have found that Johnson's behavior presented a provocation adequate to produce such a degree of fear in a man of ordinary temperament. Based on the record and evidence before us, it is exceedingly unlikely that the appellant suffered "some harm" as a result of the trial court's failure to give the jury a sudden passion instruction....
Id. at 609-10.
In her trial testimony in this case, Morgan stated that George was running and McFadden was chasing him with the gun *293 in her hand. Morgan further testified that George ran by her, grabbed her arm, swung her around, and then kept running behind her when McFadden shot him. As we noted above, we find that there is sufficient evidence on which the jury could have inferred that McFadden shot George as he was running away from her. Accordingly, if this inference negates McFadden's self-defense claim, then we must decide whether it also negates McFadden's defense of property claim as in Wooten .
In Wooten , the sudden-passion defense was similar to the self-defense claim. Both defenses focused on the interaction between the defendant and the victim. In the self-defense context, the appellant argued that deadly force was immediately necessary to defend against the victim's impending use of deadly force. In the sudden-passion context, the appellant argued that the defendant's actions toward him (pointing a gun at him) caused him to experience "a level of fear that caused him to lose control" and that the victim's actions "presented a provocation adequate to produce such a degree of fear in a man of ordinary temperament." Id. at 610. Therefore, rejection of self-defense negated sudden passion as well. Id.
Here, however, the facts which supported self-defense involved George's actions towards McFadden, whereas the facts which support defense of property involve George's actions towards McFadden's property. Obviously, it is difficult to conceive of a situation where a defendant could establish self-defense by shooting an unarmed person running away from her. Yet, if the person is running away from the defendant but towards a gasoline-covered house with a lighter in his hand, it is conceivable that the defendant could be justified in using deadly force against that fleeing person to prevent arson. Accordingly, even if we assume that the jury believed Morgan's trial testimony rather than her pretrial statement and conclude that McFadden was chasing George at the time he was shot, the testimony established that George was running in the direction of the rear of the vehicle where the gasoline-soaked boxes were located.
In her pretrial statement, Morgan stated that, after George poured gasoline on the boxes, "[h]e had a green lighter in his hand[, and] [h]e then ran into the house." David Gray, Panola County Justice of the Peace, testified that State's Exhibits 6 and 17 depicted a pool of blood on the ground beside the rear passenger door of the Yukon and a green Bic lighter on the ground. Additionally, State's Exhibit 47 is a photograph of the cigarette lighter, and the attached evidence form states, "Place Evidence found E.E. George property found beside red GMC Yukon passenger side rear door on ground." Finally, Morgan's testimony establishes that George's body was found in the location where the lighter was found. Accordingly, there is evidence in the record showing that, even if the jury inferred that George was running from McFadden when he was shot, he was running towards the gasoline soaked boxes with a lighter in his hand. Consequently, the fact that the jury rejected McFadden's self-defense claim does not negate her claim for the use of deadly force in defense of property.
b. Does the Record Establish Some Harm to McFadden?
In the State's opening statement, it argued that, as Morgan was loading boxes into the vehicle, she heard a couple of shots ring out and then saw George "come[ ] running with [McFadden] in hot pursuit, chasing him." He continued, "[a]nd at some point, [George] gets behind [Morgan], the voice of reason, and [Morgan] tries to stop [McFadden]. And [McFadden]
*294 shoots a couple of times or however many times over and around [Morgan]."[17] We have already summarized Morgan's trial testimony where she testified that McFadden shot George when he was running from her. And, in closing arguments, the State argued,
[Morgan] said she was at the end of the car and she heard two shots and looked around, stood up, and here comes [George] running by. Here comes the defendant running by. What is she doing? She's running by holding this gun, pointing it at Mr. George.
Mr. George, if he had ever been aggressor, was retreating. He was retreating. He was running away. People who run away aren't threats. They're trying to flee.
And finally, the State argued, "Self-defense? If I'm running away from you and you shoot me, that's not self-defense."
As we held above, there is sufficient evidence on this record for the jury to have rejected McFadden's self-defense argument. However, unlike a legal sufficiency review where we interpret the evidence in the light most favorable to the verdict, Brooks , 323 S.W.3d at 912, in considering whether a trial court erred in giving a defensive charge we are admonished that our "duty is to look at the evidence supporting the charge, not on the evidence refuting it." Trevino v. State , 100 S.W.3d 232, 239 (Tex. Crim. App. 2003) (per curiam) (citing Sanchez v. State , 745 S.W.2d 353, 357 (Tex. Crim. App. 1988) ). Had McFadden received the defense of property instruction she requested, she could have argued that the same facts which negated her self-defense claim supported her defense-of-property claim. Moreover, having confessed to the underlying offense, the failure to instruct the jury on defense of property "preclude[d] the only path to acquittal in light of the required admission of guilt if not for the defense."[18] 43 George E. Dix, et al., Texas Practice Series: Criminal Practice & Procedure § 43.30 (2016-2017 ed.). Consequently, we find that McFadden sustained "some harm" from the trial court's failure to instruct the jury on defense of property.
III. Conclusion
For all of the foregoing reasons, we reverse the trial court's judgment and remand the case to the trial court for a new trial.

McFadden's vehicle was a GMC Yukon sports-utility vehicle (SUV).

Morgan gave a written statement to the sheriff's office on October 12, 2003, which she read to the jury. The statement, in part, follows:
[George] started throwing glasses around into the sink and onto the floor. They both broke and [George] cut his hand on one of them. I saw him grab a paper towel and wrap his hand. They kept arguing and [George] was enraged.... [George] said [McFadden]-[McFadden] could take her clothes but that she couldn't have anything else. [George] then said if she didn't bring back his wallet it would be the biggest damn bonfire you had ever seen. He then said she had until midnight tomorrow night that he was going to pour gas on her stuff then burn it. [George] kept telling [McFadden] that he was going to kill her. He said to her "You know not to" ... "[expletive] with me, I'll kill you and you know that." [George] then turned to me and said "She knows that I'm not [expletive] around and that I'll kill her." I asked [George] if we could get some of her stuff and some of my belongings also. [George] told me that it would be all right to get her clothes but not to take any of her other belongings.

In her statement to police, Morgan stated she heard two shots.

The autopsy report was admitted at trial, and it showed that George's cause of death was a gunshot wound to the head, which entered into his left cheek. In addition, the report stated that the trajectory of the bullet was found to be "left to right, front to back, and upward."

After Morgan spoke to 9-1-1, she handed the telephone to McFadden. Morgan heard McFadden telling the 9-1-1 operator to "hurry."

Gray did not recall detecting the odor of gasoline on either McFadden or Morgan.

Amanda Ross, McFadden's daughter, testified that she was present when the photographs of McFadden's injuries were taken. Ross described bruising on McFadden's leg, arms, and neck; behind her ear; on her "back side"; and in her rib area.

In addition to McGuire's testimony regarding George's temperament, David was asked about an incident where he was alleged to have informed a deputy that George had threatened to kill him, "pulled a knife" on him, "was waving a gun around the air, threatening to kill everybody at the residence, and that [George] had hit [David's mother] on the left side of the forehead." David responded, "I recall an incident, but I don't recall it being that serious."

"A person commits [the] offense [of murder] if he ... intentionally or knowingly causes the death of an individual," or "intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual." Tex. Penal Code Ann. § 19.02 (West 2011).

We note that the autopsy report also shows that George suffered from injuries consistent with an assault; however, the record is unclear as to when or how these injuries occurred. Under the heading "OTHER INJURIES," the report stated,
Multiple small contusions ranging in color from green to purple are on the right and left sides of the anterior chest surrounding the nipples. Red-purple contusions are on the anterior surfaces of the upper arms. A crusted linear abrasion is on the left posterior forearm. Multiple red-purple contusions are on the medial surfaces of the thighs. Remote, healed fractures are in the right posterior ribs six and seven and left posterior ribs four and five.

McFadden's proposed instruction on defense of property was, in part, as follows:
Now, if you find from the evidence beyond a reasonable doubt that on the occasion in question the defendant, [McFadden], shot and killed [George], the deceased, but you further find from the evidence, or you have a reasonable doubt thereof, that at the time of the shooting the defendant reasonably believed that the deceased was about to commit arson against the Defendant's property without the defendant's effective consent with the intent to commit the offense of arson, and that the defendant reasonably believed, viewing the circumstances from her standpoint alone, that deadly force was immediately necessary to prevent the deceased's imminent commission of arson, and that the defendant further reasonably believed that her property could not, under the circumstances, be protected by any other means than deadly force, or, if it could be so protected by other means, defendant reasonably believed from her standpoint at the time that the use of force other than deadly force to protect her property would expose her or her family, or both, to a substantial risk of death or serious bodily injury, then the defendant would have the right in law to use deadly force immediately to the degree then necessary to protect her property, and if you find the facts so to be, or if you have a reasonable doubt as to such matters, then you will resolve that doubt in defendant's favor and say by your verdict "Not Guilty."

Section 9.41 states,
(a) A person in lawful possession of land or tangible, movable property is justified in using force against another when and to the degree the actor reasonably believes the force is immediately necessary to prevent or terminate the other's trespass on the land or unlawful interference with the property.
(b) A person unlawfully dispossessed of land or tangible, movable property by another is justified in using force against the other when and to the degree the actor reasonably believes the force is immediately necessary to reenter the land or recover the property if the actor uses the force immediately or in fresh pursuit after the dispossession and:
(1) the actor reasonably believes the other had no claim of right when he dispossessed the actor; or
(2) the other accomplished the dispossession by using force, threat, or fraud against the actor.
Tex. Penal Code Ann. § 9.41 (West 2011).

In this case, there is no evidence that if McFadden did not believe that deadly force was immediately necessary that she still believed that force of some kind was immediately necessary. In other words, either she reasonably believed deadly force was immediately necessary or she did not believe that force of any kind was immediately necessary. Therefore, the first of Section 9.42's statutory requirements-"[she] would be justified in using force against the other under Section 9.41"-is subsumed in the second statutory requirement-that she "reasonably believe [d] the deadly force [was] immediately necessary" to prevent George from committing arson. Tex. Penal Code Ann. § 9.42. Therefore, we will consider these two requirements together.

Setting fire to the boxes themselves could constitute criminal mischief. See Tex. Penal Code Ann. § 28.03(a)(1) (West Supp. 2017) ("A person commits an offense if, without effective consent of the owner: (1) he intentionally or knowingly damages or destroys the tangible property of the owner."). A person may also use deadly force in defense of property to prevent someone from destroying it by criminal mischief, but only if the criminal mischief occurred during the nighttime. Tex. Penal Code Ann. § 9.42(2)(A). In this case, however, the evidence is undisputed that the events at issue occurred during the daytime.

Though not dispositive of this question, it is worth noting that Section 6.04(b) of the Texas Penal Code provides, "(b) A person is nevertheless criminally responsible for causing a result if the only difference between what actually occurred and what he desired, contemplated, or risked is that: (1) a different offense was committed; or (2) a different person or property was injured, harmed, or otherwise affected." Tex. Penal Code Ann. § 6.04(b) (West 2011). Also known as the "transferred intent" rule, Section 6.04(b)(2) makes a defendant criminally responsible if he intends to harm one person or piece of property and actually harms another. Yet, Section 6.04(b)(1) also makes a defendant criminally responsible when he commits a greater offense than the one he actually intended. The Court of Criminal Appeals addressed this second type of transferred intent in Thompson v. State , 236 S.W.3d 787 (Tex. Crim. App. 2007).
In Thompson , the defendant beat a child with a tree branch in order to discipline him. Id. at 789. While the defendant's intent was to merely cause bodily injury to the child, the evidence at trial established that the victim's bruising was so severe that, "as a result of this condition, the child would have died from renal failure if he had not received prompt medical attention." Id. at 788. After discussing the history of Section 6.04(b)(1), the Court of Criminal Appeals concluded
Given the plain language and the history of the provisions at issue, we conclude that § 6.04(b)(1) does indeed authorize the transfer of a culpable mental state between offenses contained in the same statute and also between greater and lesser included offenses. That authorization may be overridden by language defining a particular offense, as in the offense of capital murder, but no such impediment arises with respect to the injury-to-a-child offense.
Id. at 800.
Consequently, while George might certainly have intended the offense of criminal mischief in setting fire to McFadden's property inside the vehicle, had the fire spread and destroyed the vehicle as well, he could have been charged with arson. Of course, as noted above, McFadden did not have to show that a jury would have found George guilty of arson on these facts. Rather, she need only have presented some evidence from which a jury could have found that she reasonably believed that the use of deadly force was immediately necessary to prevent him from committing arson. Yet, the reasoning behind Section 6.04(b)(1) that would have allowed the State to prosecute George for arson had the fire spread to the vehicle likewise supports the conclusion that McFadden could reasonably have believed that he was in the process of committing arson.

Moreover, in this case, defense of property was not "the only path to acquittal in light of the required admission of guilt if not for the defense" because McFadden requested and received a self-defense instruction. 43 George E. Dix, et al., Texas Practice Series: Criminal Practice & Procedure § 43.30 (2016-2017 ed.). Therefore, even under the reasoning of Professors Dix and Schmolesky, harm would not be automatic. But because the jury rejected the self-defense claim, the failure to give the defense of property instruction in light of her admission of guilt to the offense is still a factor to consider in deciding whether McFadden was harmed by the trial court's ruling.

When the State attempted to offer evidence to support that McFadden shot over and around Morgan, McFadden objected, and the trial court sustained her objection. The trial court then instructed the jury to disregard that testimony. Accordingly, the record does not support this claim by the State.

See infra note 14.