

# NUMBER 13-23-00545-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

ROBERT MICHAEL FRAZIER,                                    Appellant,

v.

THE STATE OF TEXAS,                                         Appellee.

## ON APPEAL FROM THE 24TH DISTRICT COURT
## OF REFUGIO COUNTY, TEXAS

## MEMORANDUM OPINION

**Before Justices Benavides, Longoria, and Silva**
**Memorandum Opinion by Justice Silva**

Appellant Robert Michael Frazier was charged with murder following the shooting

of his cousin Andrew Williams. A jury convicted Frazier of the lesser-included offense of

manslaughter, a second-degree felony, and sentenced him to twenty years' confinement. *See* Tex. Penal Code Ann. §§ 12.33, 19.04. In one issue, Frazier asserts the evidence is legally insufficient to support the jury's rejection of his self-defense claim. We affirm.

## I.   BACKGROUND

At approximately 8:43 p.m. on November 15, 2021, Refugio Police Department (RPD) Officer Bruce Radford received a call from dispatch concerning shots fired at a residence. Officer Radford testified at trial that he was the first to arrive at the residence. Officer Radford was immediately approached by a man, later identified as Frazier, who kept repeating that he had shot someone. Frazier also notified Officer Radford that he had left the weapon on the hood of a vehicle parked in the driveway.[1] Officer Radford described Frazier as cooperative, but scared, and placed Frazier inside his patrol unit before entering the residence to further assess the situation.

Once inside, Officer Radford was greeted by Jessica Trevino, Andrew's on-and-off girlfriend and Frazier's sister-in-law. Trevino told Officer Radford that she and Andrew had been in a "physical altercation" when Frazier intervened and shot Andrew. Trevino's three children and Christopher Williams[2] were also inside the residence at the time of the shooting.

Andrew was found lying on the living room floor with a visible bullet wound injury on his chest and declared deceased on-scene. Forensic pathologist Dr. Suzanna Dana

---

[1] Refugio County Sheriff Officer Alejandro Alvarez testified that Officer Radford instructed him to secure the weapon. Alvarez noted that as he unloaded the weapon, he "observed a spent shell casing inside the chamber" that appeared to be stuck.

[2] It is unclear from the record what, if any, relation Christopher Williams shares with Andrew or anyone else in the residence.

2

testified that Andrew died of a gunshot wound to the chest. She explained that the bullet entered his chest, struck his heart, and continued into the abdomen, through his liver and stomach, before fracturing his rib and exiting his body.

Frazier was taken to the county jail, where he was interviewed by RPD Investigator Danny Madrigal. Frazier provided the following written statement, which was admitted at trial:

> I went to the door and knocked and Christopher Williams answered the door and he just stood in the doorway as if trying to block me out. I walked by him and made my way inside the house. I could Andrew [sic] screaming at [Trevino] and the kids, and I could hear the kids crying. The music was also on loud in the house. I walked over to the main bedroom in the house and Andrew was yelling at [Trevino].
>
> I called Andrew out to the living room and Andrew came out of the bedroom[,] and we talked for a while in the living room. I told Andrew to calm down because the kids were watching them. Andrew stated that he didn't care, and stated that "that bitch" made me [sic] lose out on $400.00.
>
> Andrew then got upset again and he then went back into the bedroom and he began arguing with [Trevino]. I followed him and saw him grab [Trevino] and slam her into the television that was on top of a dresser.
>
> I kept telling him to chill out. I stepped into the bedroom to get him out, and Andrew then pushed me out the doorway of the bedroom. I then drew my gun which I had in my pocket and pointed it at Andrew. I have a Taurus G2C 9 mm handgun which I always carry on my person. I bought the gun at Academy sometime in September.
>
> Andrew then started walking at me, and I got scared, so I shot a round at him. I tried to shoot him on his shoulder just to wound him so that he could stop charging at me.
>
> I wound up shooting him in his chest. I backed up into the living room, and Andrew walked into the living room and fell to the floor. [Trevino] then ran out of the house with the kids. Christopher Williams was in the kitchen at this time.
>
> . . . .

3

At the time I shot Andrew, I felt threatened to the point that I felt that I needed to defend myself by shooting Andrew. I did not feel that I could safely remove [Trevino] and her children from the house because Andrew came at me with aggression.

Investigator Madrigal opined that Frazier was taller and larger built than Andrew and stated that Andrew did not have a weapon in his possession when he was shot. Investigator Madrigal further testified that he had also interviewed Christopher, who confirmed that he answered the door when Frazier arrived. According to Christopher, after Frazier "brushed past him," Christopher then returned to the living room, where he was soon joined by Frazier and Andrew. At some unspecified point, Christopher went into the kitchen and heard "more commotion going on between" Trevino and Andrew. Christopher recalled hearing Frazier tell someone to "calm down, to chill," and then shortly thereafter, Christopher heard a "pop" followed by the sound of "something hard [hitting] the floor." Christopher next saw Andrew crawling into the living room, where he collapsed.

Text messages between Trevino and Andrew on the evening of the shooting were also admitted at trial. In the expletive-laden text messages, Andrew accused Trevino of having "bad energy" and being the reason his money "vanish[es]." He threatened to "leave for good" before telling her that it would be "best if [she] leave."

At trial, Trevino provided context for the text messages, stating that she and Andrew had been together "on and off" for nine years; he had a gambling addiction and was unemployed; and he had continuously been verbally and physically abusive with her throughout their relationship. Trevino testified that though the altercation began while they were both at home texting each other in different rooms, it escalated once Andrew began "yelling" at her to leave. In response, Trevino contacted a friend and requested that she

4

send Frazier to pick up her and her children. Trevino then gathered the children and their belongings and waited in Trevino's bedroom for Frazier to arrive. Trevino explained that Frazier, as well as other members of her family, had picked her up before for similar reasons.

Trevino stated that as she was stepping out into the hallway, Andrew told her to "get the f[-]ck out of there, that [her] ride was [t]here." Andrew then hit her in the back of her head and ordered her back into the bedroom. Trevino said she never heard Frazier enter the home. Trevino first noticed Frazier after Andrew had "pushed [her] into the dresser" in the bedroom and heard Frazier tell Andrew to stop. Trevino stated that Frazier and Andrew started arguing, and Frazier pulled out a gun. In response, Andrew "went at [Frazier] aggressively," and Trevino turned her sights to her children. Trevino testified she was facing her children when she heard a sound: "I just heard a pop, and I turn around, and Pooh[3] fell to the ground."

After the State rested, Frazier called two witnesses. Each testified that Frazier was not an "angry" person, nor had he displayed any aggressive tendencies or a propensity for violence in the past.

The jury charge instructed the jury on self-defense and on the lesser-included offense of manslaughter. The jury returned a guilty verdict on the lesser-included offense of manslaughter, and Frazier was sentenced to twenty years' imprisonment. This appeal followed.

---

3 "Pooh" was Trevino's nickname for Andrew.

5

## II. SELF-DEFENSE

In his sole issue, Frazier challenges the legal sufficiency of the evidence to support the jury's negative self-defense finding.

### A. Standard of Review and Applicable Law

When reviewing a challenge to the sufficiency of the evidence supporting a criminal conviction relative to a claim of self-defense:

> we do not look to whether the State presented evidence which refuted the self-defense testimony, but rather we determine whether after viewing all the evidence in the light most favorable to the prosecution, any rational trier of fact would have found the essential elements of [the offense] beyond a reasonable doubt and also would have found against appellant on the self-defense issue beyond a reasonable doubt.

*Braughton v. State*, 569 S.W.3d 592, 609 (Tex. Crim. App. 2018) (quoting *Saxton v. State*, 804 S.W.2d 910, 914 (Tex. Crim. App. 1991)); *Rankin v. State*, 617 S.W.3d 169, 181 (Tex. App.—Houston [1st Dist.] 2020, pet. ref'd). We ask whether "[t]here is sufficient evidence in the record to rationally support the jury's rejection of appellant's version of the events." *Braughton*, 569 S.W.3d at 611. The factfinder is the sole judge of the witnesses' credibility and their testimony's weight, and we may not usurp the jury's role by substituting our own judgment. *Id.* at 608. The factfinder may choose to disbelieve all or any part of a witness's testimony provided this decision is "rational in light of the totality of the record." *Id.* at 611. "A court's role on appeal is restricted to guarding against the rare occurrence when the factfinder does not act rationally." *Nisbett v. State*, 552 S.W.3d 244, 262 (Tex. Crim. App. 2018).

A person is justified in using deadly force to the degree he reasonably believes such force is "immediately necessary" to "protect against another person's use or

attempted use of unlawful deadly force." TEX. PENAL CODE ANN. § 9.32(a)(2). A reasonable belief is one that an ordinary and prudent person would hold under the same circumstances. *Id.* § 1.07(a)(42). The use of force against another is not justified in response to verbal provocation alone. *Id.* § 9.31(b)(1).

## B.    Analysis

Frazier argues the evidence presented at trial, namely, Andrew's displays of physical aggression towards Trevino and himself, establishes that he feared for his life and was acting in self-defense when he brandished a gun and then pulled the trigger. While we acknowledge there is evidence that Andrew physically assaulted Trevino and Frazier, the jury was cognizant of the absence of evidence that Andrew used or attempted to use unlawful deadly force against Frazier at the time of the shooting. *See McFadden v. State*, 541 S.W.3d 277, 285 (Tex. App.—Texarkana 2018, pet. ref'd) ("Although there is evidence that George physically assaulted McFadden while they were inside the house, there is no evidence that George used or attempted to use unlawful deadly force against McFadden at the time of the shooting."). Moreover, the evidence that Frazier believed his life or Trevino's life was in danger came entirely from his own statement to law enforcement, which the jury was free to disbelieve. *See Sharp*, 707 S.W.2d at 614; *Hocko v. State*, 590 S.W.3d 680, 692 (Tex. App.—Houston [14th Dist.] 2019, pet. ref'd) (noting the defendant's statements do not conclusively prove a claim of self-defense because the jury could reject the defendant's version of events); *see also Gonzalez v. State*, No. 13-23-00025-CR, 2024 WL 2349321, at *5 (Tex. App.—Corpus Christi–Edinburg May 23, 2024, no pet. h.) (mem. op., not designated for publication) ("Gonzalez was the only

7

witness that testified he acted in self-defense, and the jury was not obligated to believe him.").

Frazier additionally asserts that his lack of a violent history and his behavior immediately before and after he shot Andrew is further evidence he had acted in self-defense. However, Frazier was charged with murder and convicted of the lesser-included offense of manslaughter. *Compare* TEX. PENAL CODE ANN. § 19.02 (murder), *with id.* § 19.04 (manslaughter). By finding Frazier guilty of manslaughter, the jury implicitly (1) found Frazier did not possess the culpable mental state of knowingly or intentionally when he caused Andrew's death *and* (2) rejected his self-defense claim. *See Braughton*, 569 S.W.3d at 611 ("[B]y its implicit rejection of appellant's defenses in finding him guilty, the jury necessarily signaled its disbelief in this testimony as lacking in credibility and the legal sufficiency standard does not permit us to substitute our view of the credibility of the witness testimony for the jury's."); *Adeniyi v. State*, No. 14-22-00143-CR, 2024 WL 807233, at *6–7 (Tex. App.—Houston [14th Dist.] Feb. 27, 2024, no pet.) (mem. op., not designated for publication) (concluding jury implicitly rejected appellant's self-defense claim where it returned guilty verdict for criminally negligent homicide).

Furthermore, the record contains evidence to support the jury's rejection of Frazier's self-defense claim. Andrew, in addition to being shorter and smaller in stature than Frazier, was not armed with a weapon. Frazier himself conceded he never saw Andrew with a weapon. *See Braughton*, 569 S.W.3d at 611 ("No witness testified that [the victim] had displayed a weapon or made any threat to use a weapon during the physical altercation with Braughton Sr."); *see also Anderson v. State*, No. 05-22-00490-CR, 2024

8

WL 1089480, at *4 (Tex. App.—Dallas Mar. 13, 2024, no pet.) (mem. op., not designated for publication) (considering the victim's lack of a weapon and appellant's concession that he never saw the victim with a weapon in its self-defense analysis). This evidence was compounded by Trevino's testimony that Frazier had previously intervened in physical confrontations between her and Andrew without injury to himself. Trevino further testified that on the evening in question, Frazier drew his weapon and pointed it at Andrew *before* Andrew "rushed him"—which was contrary to Frazier's statement that Andrew "walked at" him first. *See Febus v. State*, 542 S.W.3d 568, 572 (Tex. Crim. App. 2018) ("A jury may accept one version of the facts and reject another, and it may reject any part of a witness's testimony.").

"[T]his case in every respect comes down to the jury's assessment of the credibility of the witnesses and evidence, and therefore, we must defer to the jury's verdict in this case." *See Braughton*, 569 S.W.3d at 611. Viewing the evidence in the light most favorable to the verdict, a rational jury could have reasonably found that Frazier— confronted with non-deadly force—drew his gun and fired without justification, recklessly shooting Andrew, and thereby causing his death. *See Harris v. State*, 668 S.W.3d 83, 91 (Tex. App.—Houston [1st Dist.] 2022, pet. ref'd); *Gaona v. State*, 498 S.W.3d 706, 709– 10 (Tex. App.—Dallas 2016, pet. ref'd). We overrule this issue.

###### III. CONCLUSION

We affirm the trial court's judgment.

CLARISSA SILVA
Justice

Do not publish.
TEX. R. APP. P. 47.2 (b).

Delivered and filed on the
19th day of September, 2024.