# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

=====

## NO. 03-18-00191-CR

=====

**Osiel Benitez-Benitez, Appellant**

**v.**

**The State of Texas, Appellee**

=====

### FROM THE DISTRICT COURT OF TRAVIS COUNTY, 450TH JUDICIAL DISTRICT
### NO. D-1-DC-16-202995, HONORABLE BRAD URRUTIA, JUDGE PRESIDING

=====

## M E M O R A N D U M   O P I N I O N

Osiel Benitez-Benitez[1] was charged with murdering Rigoberto Castillo and with committing three counts of aggravated assault with a deadly weapon against Elvira Flores, Esteban Manjarrez, and Heydi Castellanos.[2] *See* Tex. Penal Code §§ 19.02 (listing elements of offense of murder and specifying that offense is typically first-degree felony), 22.02 (setting out elements of offense of aggravated assault and explaining that offense is, in general, second-degree felony). Prior to the start of trial, Osiel waived his right to a jury trial. At the end of the guilt-or-innocence phase, the district court found Osiel guilty of the charged offenses. During the punishment phase, the district court sentenced Osiel to thirty-eight years' imprisonment for the murder conviction, to fifteen

---

[1] Because the defendant has the same surname as some of the witnesses in this case, we will refer to the defendant and those witnesses by their first names for ease of reading.

[2] Osiel was also charged with aggravated assault with a deadly weapon in retaliation against a witness. *See* Tex. Penal Code § 22.02(b)(2)(C). However, the district court found Osiel not guilty of that offense.

years' imprisonment for one of the aggravated-assault convictions, and to ten years' imprisonment for the remaining two aggravated-assault convictions. *See id.* §§ 12.32, .33 (setting out permissible punishment ranges for first-degree and second-degree felonies). On appeal, Osiel contends that the district court failed to consider evidence indicating that he was acting in self-defense or under the influence of sudden passion. We will affirm the district court's judgments of conviction.

## BACKGROUND

As set out above, Osiel was charged with murder and with three counts of aggravated assault with a deadly weapon. The following summary comes from the testimony and evidence presented at trial.

Late on the night in question, several groups of individuals congregated at a taco stand. Osiel was in one group along with his cousin Juventino Benitez and Osiel's friend Guillermina Perez. Castillo was in a second group along with Castillo's wife Maribel Calderon and Castillo's friends Flores and her husband Manjarrez. In addition to those two groups, Castellanos was at the taco stand with her husband Gerardo Barraza. Hector Macias was also present at the taco stand on that night and took three short videos with his cell phone.

Although the cause of the confrontation is disputed, what is not disputed is that Osiel and Juventino became involved in a physical altercation with Castillo and other individuals while the groups were waiting to place their orders at the taco stand. Moreover, Osiel ended up on the ground during the conflict. After standing up, Osiel walked to his truck, retrieved a handgun, walked back to the taco stand, and shot Castillo multiple times. During the incident, Castillo sustained ten bullet wounds and died from his injuries. In addition, Flores was shot in the abdomen, and her

2

husband Manjarrez sustained a bullet injury to his back. Moreover, Castellanos was shot in her foot. Based on the information and descriptions provided by the individuals present at the scene, the investigating police officers were able to identify Osiel as the suspect and arrest him at his house shortly after the offenses occurred.

During the trial, the three short videos taken with Macias's phone were played for the district court. The videos chronicle a fight between several men, capture Osiel on the ground at some point during the skirmish, document Castillo punching and kicking Osiel in the head while Osiel is on the ground, and show Osiel later shooting a handgun at Castillo multiple times. In addition to the recordings from Macias's phone, the State also presented footage from a security camera located behind the taco stand. Because of the camera's location, the recording does not capture what was happening in front of the taco stand where the customers were either eating their tacos or waiting for their orders, but the recording does show the events that occurred on either side and in back of the taco stand. On the recording, individuals can be seen physically fighting with one another, and Osiel is seen walking to his truck after a lull in the violence. Further, the recording shows that Osiel spends approximately forty seconds at his truck before walking back to the front of the taco stand. Moreover, the recording captures dozens of customers running from the taco stand shortly after Osiel returns to the front of the taco stand and shows one person falling to the ground in the parking lot behind the taco stand. Finally, the recording captures Osiel hurrying to his truck shortly after the customers dispersed, getting in the driver's seat, and driving his truck out of the parking lot.

During the trial, the State called to the stand several of the individuals who were present at the taco stand during the incident, including Calderon, Macias, Flores, Manjarrez,

3

Castellanos, and Barraza. In addition, the State called several of the investigating officers, including Officer Abraham Deutchman. When presenting his defense, Osiel called Perez, Juventino, and Osiel's wife, Lourdes Resendis.

In her testimony, Calderon explained that while Castillo was ordering tacos, Juventino tried to place his order at the same time and was "kind of aggressive."[3] Further, Calderon recalled that Castillo told Juventino to wait until Castillo had finished placing his order, that Juventino shoved Castillo, that Castillo shoved back, that a fight broke out, that Osiel hit Castillo, that Castillo hit Osiel in response, that the fight broke up, that Castillo went to pay for his tacos, and that Castillo apologized to the employees of the taco stand. Next, Calderon testified that Osiel returned to the taco stand, that Osiel shot Castillo, and that Osiel continued to shoot while the other customers ran. Finally, Calderon related that Castillo did not have a weapon with him.

When called to the stand, Macias testified that he observed Osiel and Juventino arguing with Castillo, that the individuals started physically fighting, that Macias thought that Osiel threw the first punch, that Castillo won the fight, that the fighting stopped, that Osiel walked to his truck, and that Osiel returned to the taco stand with a gun, "planted his foot on the floor, and started shooting at" Castillo. Further, Macias related that Castillo did not have a weapon on him.

Next, the State called Flores to the stand, and she testified that Castillo told Osiel and Juventino to get in line when they tried to place a taco order, that Osiel and Juventino started a fight with Castillo, that Osiel "tripped on something and fell backwards," that Osiel "got up and . . .

---

[3] During the trial, several of the witnesses referred to the individuals involved in this case by what they were wearing or by their physical appearance. For ease of reading, we will refer to the individuals involved by their names.

4

went off," that Osiel returned to the taco stand with a gun, that Osiel pointed the gun at Castillo, and that Osiel fired multiple shots. Further, Flores related that Castillo did not have any weapons on him. Finally, Flores explained that she and Manjarrez ran when Osiel started shooting, that she was shot in the abdomen, and that a bullet grazed Manjarrez's back.

Following his wife's testimony, Manjarrez was called to the stand. In his testimony, Manjarrez also related that Castillo told Osiel and Juventino to get in line after the two men tried to order even though Castillo got there first, that the two men started arguing with Castillo, and that although Manjarrez was not sure who threw the first punch, he saw Osiel and Juventino attack Castillo. Further, Manjarrez related that he was able to break up the fight, that Osiel and Juventino "kept insulting" Castillo and "insisting that he keep fighting" even after the fighting stopped, that Osiel went to his vehicle, that Osiel returned with a gun, and that Osiel fired "a lot" of shots at Castillo. When describing the fight, Manjarrez stated that Osiel was on the ground at one point. Finally, Manjarrez related that he was shot in the back while he was running from Osiel.

After Manjarrez and Flores finished testifying, Castellanos was called to the stand and explained that she saw a fight break out between two groups, that Osiel "tripped on some steps . . . and fell backwards," that Castillo kicked Osiel once "in the face with his boots," that Osiel went to his truck, and that Osiel returned with a handgun. Next, Castellanos related that she ran from Osiel but was shot in the foot.

Following Castellanos's testimony, her husband Barraza was called to testify. On the stand, Barraza related that individuals started arguing over who was next at the taco stand, that Osiel started the physical fight, that Osiel was knocked to the ground, that Castillo kicked Osiel in

5

the head while Osiel was on the ground, that Osiel got up and "calmly walked away to his truck," that Osiel returned with a gun, and that Osiel started firing.

After the State finished calling witnesses who were at the taco stand when the incident occurred, the State called Officer Deutchman to the stand. In addition to discussing his assessment of the scene, Officer Deutchman explained that Manjarrez told him that Castillo kicked Osiel after Osiel was knocked to the ground during the fight and that Barraza told Officer Deutchman that Osiel had a head injury from the fight.

When presenting his defense, Osiel called Perez to the stand, and she testified that Osiel told Castillo that there was a line after Castillo started placing a taco order, that Osiel and Castillo exchanged words, that Castillo punched Osiel, that Osiel fell to the ground, that Osiel lost consciousness when he hit the ground, and that Castillo and others continued to hit Osiel while he was down. Further, Perez related that she saw Osiel get up and walk away before returning with a gun. Finally, Perez stated that Osiel shot Castillo, that Osiel was only targeting Castillo, and that she believed that Osiel intended to kill Castillo.

Next, Osiel called Juventino to the stand. In his testimony, Juventino recalled that Castillo "got really mad" at the taco stand when Osiel and Juventino went to place their orders, that Castillo hit Osiel, that Osiel got knocked down to the ground, that people intervened to stop the fight, that Juventino challenged Castillo to a fight, and that Juventino saw Osiel shoot a handgun. Additionally, Juventino explained that Osiel was "beat up" that night, that Osiel seemed "disoriented," and that Osiel was angry and humiliated.

Finally, Osiel called his wife Resendis to the stand. In her testimony, Resendis recalled that Osiel was bleeding when he returned home from the taco stand, that Osiel "looked

6

different" after returning home, and that he looked "[l]ike when somebody hits you and you don't know what you're doing." Furthermore, Resendis testified that Osiel told her that night that he made a mistake and would have to pay for it.

During the trial, the State introduced into evidence photos of the scene and of injuries that the various victims sustained on the night in question. Similarly, Osiel introduced into evidence photos of injuries that he sustained that night, including injuries to his head, and Osiel also introduced into evidence photos of his truck and home indicating that he was bleeding after leaving the taco stand.

In his closing arguments during the guilt-or-innocence phase, Osiel argued that he was acting in self-defense when he shot Castillo.

After considering all of the evidence presented at trial, the district court found Osiel guilty of the charged offenses.

During the punishment phase, the State called various members of Castillo's family to the stand to discuss what type of man Castillo was and how Castillo's death affected them. After the State finished calling witnesses, Osiel called to the stand his son Giovanni Benitez, his son Edgar Benitez, his daughter Brissa Benitez, his ex-wife Gloria Carbajal, and his wife Resendis. During their testimonies, the witnesses explained that Osiel had never been in trouble with the law before, that Osiel did not have a temper, that Osiel was not a violent man, and that Osiel was a very responsible man. In his closing argument, Osiel asserted that Castillo provoked Osiel by kicking him in the head after he was on the ground, that being kicked in the head was "the adequate cause that rendered his mind incapable of cool reflection," that "[h]e was acting under the sudden passion of the provocation that he suffered," and that the "provocation arose at the time of the offense and

7

is the reason that this happened." Finally, Osiel urged the district court "to find that Osiel caused the death of" Castillo "under the immediate influence of sudden passion."

After considering the evidence presented at trial, the district court implicitly rejected Osiel's sudden-passion claim by punishing the murder conviction as a first-degree felony rather than as a second-degree felony.

## DISCUSSION

**Self-defense**

In his issue on appeal, Osiel contends that the evidence was legally insufficient to support the district court's rejection of his self-defense claim. In particular, Osiel asserts that the evidence showed that Castillo was the initial aggressor and that Osiel sustained several injuries to his head from being "beaten to the ground and violently kicked." Further, Osiel contends that the evidence showed that Castillo was an "aggressive brawler" and that Castillo "continued to inflict potentially deadly blows on" Osiel even when Osiel was on the ground "in a state of semi-con[s]ciousness." Moreover, Osiel argues that he had "every reason to believe that his life was in jeopardy."

As set out above, Osiel was convicted of murder and three counts of aggravated assault with a deadly weapon. Under the Penal Code, an individual commits murder if he "intentionally or knowingly causes the death of an individual." Tex. Penal Code § 19.02(b)(1). Chapter nine of the Penal Code also specifies that "[i]t is a defense to prosecution that the conduct in question is justified under" that chapter. *Id.* § 9.02. One justification listed in chapter nine is self-defense, which provides that "a person is justified in using force against another when and to the

8

degree the actor reasonably believes the force is immediately necessary to protect the actor against the other's use or attempted use of unlawful force." *Id.* § 9.31(a). "The use of force against another is not justified . . . if the actor provoked the other's use or attempted use of unlawful force, unless . . . the actor abandons the encounter, or clearly communicates to the other his intent to do so reasonably believing he cannot safely abandon the encounter" and unless "the other nevertheless continues or attempts to use unlawful force against the actor." *Id.* § 9.31(b)(4). Moreover, the use of deadly force is only justified in the circumstances set out by the Penal Code. *Id.* § 9.31(d). Of significance to this case, "[a] person is justified in using deadly force against another . . . if the actor would be justified in using force against the other" as set out above and "when and to the degree the actor reasonably believes the deadly force is immediately necessary . . . to protect the actor against the other's use or attempted use of unlawful deadly force." *Id.* § 9.32(a).

"The defendant has the initial burden of production and must bring forth some evidence to support" his claim of self-defense. *See Dearborn v. State*, 420 S.W.3d 366, 372 (Tex. App.—Houston [14th Dist.] 2014, no pet.). "Once the evidence is produced, the State bears the burden of persuasion to disprove the defense." *Id.* "This burden does not require the production of additional evidence rebutting self-defense; it requires the State to prove its case beyond a reasonable doubt." *Id.* "When the trier of fact finds the defendant guilty, there is an implicit finding rejecting the defendant's self-defense theory." *Id.* "Because the State bears the burden of persuasion to disprove a" claim of self-defense "by establishing its case beyond a reasonable doubt, we review both legal and factual sufficiency challenges to the . . . rejection of such a defense under" the legal-sufficiency standard. *See Smith v. State*, 355 S.W.3d 138, 145 (Tex. App.—Houston [1st Dist.] 2011, pet. ref'd);

9

*cf. Brooks v. State*, 323 S.W.3d 893, 895 (Tex. Crim. App. 2010) (providing that "legal-sufficiency standard is the only standard that a reviewing court should apply in determining whether the evidence is sufficient to support each element of a criminal offense").

When addressing a claim that the evidence was legally insufficient to support the rejection of a self-defense claim, appellate courts "examine all of the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found beyond a reasonable doubt (1) the essential elements of the alleged offenses, and (2) against appellant on the self-defense issue." *Dearborn*, 420 S.W.3d at 372. "The trial court, as the trier of fact in a bench trial, is the sole judge of the credibility of the witnesses and the weight to be given their testimony." *Id.* at 372-73. Accordingly, "[t]he trier of fact is free to accept or reject defensive evidence on the issue of self-defense," and appellate courts "presume the trier of fact resolved any conflicting inferences and issues of credibility in favor of the judgment." *Id.* at 373. "Moreover, when there is evidence, if believed, to support a claim of self-defense, but other evidence, if believed, to support a conviction, an appellate court will not weigh in on this fact-specific determination as this is a function of" the trier of fact. *See McFadden v. State*, 541 S.W.3d 277, 285 (Tex. App.—Texarkana 2018, pet. ref'd).

In this case, the undisputed evidence presented at trial demonstrated that Osiel shot Castillo multiple times with a handgun and that the injuries that Castillo sustained resulted in his death. Accordingly, the evidence is legally sufficient to support Osiel's murder conviction.[4]

---

[4] In his prayer for relief, Osiel asserts that all four of his convictions should be "vacated" and does not limit his challenge to his murder conviction. In other words, Osiel seems to be asserting in his prayer that his self-defense claim and his claim that the offense was prompted by sudden

Turning to the evidence regarding self-defense, we note that when presenting his appellate arguments, Osiel focuses on the evidence indicating that Castillo was the initial aggressor but ignores the conflicting evidence indicating that Castillo was not the initial aggressor. *See* Tex. Penal Code § 9.31(b)(4) (providing that, in general, self-defense is not warranted where actor provoked other person's use of unlawful force). Similarly, Osiel focuses on the testimony from Perez indicating that Osiel lost consciousness and on the portion of Resendis's testimony regarding Osiel's behavior after he returned home as indicating that Osiel's mental state was altered by his injuries, but none of the other witnesses at the scene testified that Osiel lost consciousness. Moreover, in evaluating the testimony regarding the extent of Osiel's injuries and regarding whether he lost consciousness,

passion from an adequate cause applied to the aggravated-assault charges as well as the murder charge and that the evidence was insufficient to support the district court's rejection of those claims as they pertained to the aggravated-assault charges. However, Osiel does not present any argument regarding the assault convictions in the remainder of his brief. *See* Tex. R. App. P. 38.1(i) (requiring brief to "contain a clear and concise argument for the contentions made, with appropriate citations to authorities and to the record"); *see also Rodriguez v. State*, 329 S.W.3d 74, 81 (Tex. App.—Houston [14th Dist.] 2010, no pet.) (explaining that failure to cite authority for appellate issue can result in waiver). Moreover, there is no evidence in the record indicating that Osiel shot Flores, Manjarrez, and Castellanos in response to their "use or attempted use of unlawful force" or "use or attempted use of unlawful deadly force," *see* Tex. Penal Code §§ 9.31(a), .32(a)(2), and Osiel's trial attorney limited the self-defense arguments to the murder charge, *see id.* § 9.05 (explaining that even if defendant was justified in acting in self-defense, "the justification . . . is unavailable in a prosecution for the reckless injury or killing" of innocent third parties injured when defendant acted in self-defense). In addition, sudden passion is used to reduce the offense level for a murder conviction and does not apply to aggravated-assault cases. *See id.* §§ 19.02(d), 22.02; *see also LeRoy v. State*, No. 06-07-00059-CR, 2008 WL 313068, at *1 (Tex. App.—Texarkana Feb. 6, 2008, pet. ref'd) (mem. op., not designated for publication) (explaining that "a sudden-passion charge is not available for aggravated assault"). Accordingly, we limit our sufficiency review to the evidence pertaining to Osiel's murder conviction. However, we do note that the evidence pertaining to the three aggravated assault charges was legally sufficient to support those convictions because the undisputed evidence demonstrated that Osiel shot Flores, Manjarrez, and Castellanos on the night in question and that those individuals had to be medically treated for the injuries that they sustained. *See* Tex. Penal Code § 22.02(a).

the district court was able to consider the recordings from Macias's phone and from the surveillance camera, including portions showing Osiel run to his truck and drive after the shooting, as well as photos taken of the injuries to Osiel's head and of the blood found in and on Osiel's truck and at his home.

More importantly, when evaluating Osiel's claim that he acted in self-defense, the district court was able to consider the recordings chronicling Castillo's and Osiel's movements after Osiel ended up on the ground. Those recordings revealed that Osiel left the front of the taco stand after getting up, went to his truck, returned to the taco stand approximately one minute later, and shot at Castillo multiple times, and the recordings also captured that Castillo did not pursue or otherwise engage Osiel after Osiel got up off the ground. In addition, Calderon, Macias, Manjarrez, and Juventino testified that the fight was broken up before Osiel got up. Further, Perez, Juventino, Macias, Flores, Manjarrez, Castellanos, and Barraza all testified that Osiel walked away from the taco stand after getting up, and no witness testified that Castillo attempted to pursue or assault Osiel after Osiel got up. Moreover, all of the witnesses present at the taco stand testified that Osiel shot Castillo, and none of the witnesses testified that Castillo had a weapon or engaged in any violent behavior after Osiel returned to the taco stand and before Castillo was shot. On the contrary, Calderon testified that Castillo went to pay for his tacos after Osiel got up. Additionally, although evidence was presented showing injuries that Osiel sustained during the fight, no evidence was presented indicating that those injuries were life threatening. Finally, the recordings and testimony presented at trial demonstrated that Osiel ran to his truck and drove away from the scene immediately after shooting Castillo. *See Ramirez v. State*, No. 14-07-00060-CR, 2008 WL 3931403, at *4 & n.5 (Tex. App.—Houston [14th Dist.] Aug. 21, 2008, pet. ref'd) (mem. op., not designated for publication)

12

(observing that "[l]eaving the scene of a crime indicates a consciousness of guilt" and concluding that evidence was sufficient to support conviction where defendant immediately left scene "rather than staying at the location and attempting to determine if the decedent was alive, offer help, or turn himself into authorities").

Viewing the evidence presented at trial in the light most favorable to the verdict, we must conclude that the district court could have found all of the elements of murder beyond a reasonable doubt "and also could have found against [Osiel] on his self-defense claim." *See Heng v. State*, No. 01-04-00450-CR, 2006 WL 66461, at *4 (Tex. App.—Houston [1st Dist.] Jan. 12, 2006, pet. ref'd) (mem. op., not designated for publication) (determining that evidence was sufficient to support conviction and reject self-defense claim where evidence showed that defendant "left the parking lot on foot" after fight, that defendant returned to parking lot after arming himself, that victim had no weapon, and that defendant shot victim multiple times); *see also McFadden*, 541 S.W.3d at 285 (finding evidence sufficient to support rejection of self-defense claim where "the jury could reasonably have inferred from the findings of the autopsy report that [the defendant] shot [the victim] as he was looking over his shoulder[] or as he was walking or running around the right side of the rear portion of the vehicle" and where "there is no evidence that [the victim] used or attempted to use unlawful deadly force against [the defendant] at the time of the shooting" even though there was evidence that victim assaulted defendant earlier before they left victim's house); *Mendez v. State*, 515 S.W.3d 915, 921-22 (Tex. App.—Houston [1st Dist.] 2017) (noting that defendant pointed to evidence that victim was first aggressor and had "reputation for violence" but concluding that evidence was sufficient to support rejection of self-defense claim after explaining that defendant

13

ignored evidence refuting self-defense, including testimony that defendant "'hit' [victim] first," that victim was unarmed, that victim did not have reputation for violence, and that defendant inquired about destroying surveillance footage), *aff'd* 545 SW.3d 548 (Tex. Crim. App. 2018); *Reese v. State*, No. 02-10-00143-CR, 2011 WL 2755127, at *5 (Tex. App.—Fort Worth July 14, 2011, no pet.) (mem. op., not designated for publication) (explaining that jury "could have logically found beyond a reasonable doubt" that defendant acted in self-defense where evidence showed "that the initial confrontation between parties had ended at or near [defendant]'s front porch and that [defendant] had returned to his apartment before he then chose to reinitiate the confrontation by grabbing his revolver and going back to the front door and shooting toward [victim]").

**Sudden Passion**

In his issue on appeal, Osiel also contends that the evidence was insufficient to support the district court's determination that Osiel was not acting under sudden passion when he shot and killed Castillo. As support for this argument, Osiel suggests that an individual "who ha[d] been beaten as severely as" Osiel "was[] would need more time than the State suggested to recover the ability to deliberate as a normal cool headed person." Further, Osiel argues that the behavior captured by the recordings and described through the witnesses' testimonies would render anyone incapable of cool reflection. Accordingly, Osiel urges that the district court "erroneously failed to recognize that" he "killed . . . Castillo before regaining his capacity for cool reflection" and failed to recognize that a causal connection existed between the provocation and the homicide.

As specified in the Penal Code, a defendant accused of murder may raise during the punishment stage "the issue as to whether he caused the death under the immediate influence of

14

sudden passion arising from an adequate cause." Tex. Penal Code § 19.02(d). Further, the Penal Code defines "'[a]dequate cause'" as "cause that would commonly produce a degree of anger, rage, resentment, or terror in a person of ordinary temper, sufficient to render the mind incapable of cool reflection" and defines "'[s]udden passion'" as "passion directly caused by and arising out of provocation by the individual killed or another acting with the person killed which passion arises at the time of the offense and is not solely the result of former provocation." *Id.* § 19.02(a). "If the defendant proves the issue in the affirmative by a preponderance of the evidence," the offense level is reduced to that of a second-degree felony. *Id.* § 19.02(d).

"Sudden passion must arise at the time of the offense and cannot result solely from former provocation." *Moncivais v. State*, 425 S.W.3d 403, 407 (Tex. App.—Houston [1st Dist.] 2011, pet. ref'd). In addition, "neither ordinary fear nor anger alone is sufficient to establish sudden passion." *De Leon v. State*, 373 S.W.3d 644, 650 (Tex. App.—San Antonio 2012, pet. ref'd). Moreover, a "defendant must prove that the homicide occurred while the passion still existed and before there was reasonable opportunity for the passion to cool." *Moncivais*, 425 S.W.3d at 407. "[A]dequate cause is determined by applying the 'person of ordinary temper' standard, which is the same as the reasonable person standard." *Segovia v. State*, 467 S.W.3d 545, 557 (Tex. App.—San Antonio 2015, pet. ref'd) (quoting *Gonzales v. State*, 689 S.W.2d 900, 903 (Tex. Crim. App. 1985)). "Merely acting in response to provocation by another is not enough to raise the issue." *Perez v. State*, 323 S.W.3d 298, 305 (Tex. App.—Amarillo 2010, pet. ref'd). Generally speaking, if the State's evidence is sufficient to overcome a claim of self-defense, the evidence will also be sufficient to show the absence of sudden passion. *Chavez v. State*, 6 S.W.3d 56, 65 (Tex. App.—San Antonio

15

1999, pet. ref'd); *see Wooten v. State*, 400 S.W.3d 601, 609-10 (Tex. Crim. App. 2013) (providing that if jury rejects defendant's claim that deadly force was immediately necessary, it is unlikely that jury would accept claim that victim's actions were adequate to elicit level of fear needed to make person of ordinary temperament lose control).

When presenting his evidentiary challenge to the district court's negative finding on sudden passion, Osiel does not specify whether he is presenting a legal or a factual sufficiency challenge. *See Moncivais*, 425 S.W.3d at 407-09 (addressing both legal and factual sufficiency of "the jury's negative finding on the sudden passion issue"). If a defendant does not specify "whether his challenge is to the legal sufficiency, the factual sufficiency, or both," appellate courts "look to the argument and authorities presented in the brief" as well as "the relief requested" in order to determine "whether an issue challenges the legal or factual sufficiency of the evidence or both." *See Rischer v. State*, 85 S.W.3d 839, 842-43 (Tex. App.—Waco 2002, no pet.). "Otherwise, we will construe a general sufficiency challenge as a challenge to only the legal sufficiency of the evidence." *Id.* at 843.

In his brief, the language used by Osiel does not indicate which type of sufficiency challenge he is presenting. Moreover, in this portion of Osiel's brief, he cites the provision of the Penal Code governing the offense of murder and two cases discussing when an instruction for sudden passion should be included in a jury charge but does not refer to cases considering either type of sufficiency challenge. *See* Tex. Penal Code § 19.02; *Wooten*, 400 S.W.3d at 605; *McKinney v. State*, 179 S.W.3d 565, 569 (Tex. Crim. App. 2005). Moreover, in his prayer for relief, Osiel states only that his conviction "should be vacated." For these reasons, we will construe Osiel's general

sufficiency argument as a challenge to the legal sufficiency of the district court's negative finding on sudden passion.

When reviewing the legal sufficiency of a determination "on which the defendant had the burden of proof by a preponderance of the evidence, like sudden passion," reviewing courts apply "a two-step analysis." *Moncivais*, 425 S.W.3d at 407. "First," appellate courts "examine the record for any evidence that supports the . . . negative finding while ignoring all evidence to the contrary." *See id.* "Second, if no evidence supports the negative finding, then we examine the entire record to determine whether the evidence establishes the affirmative defense as a matter of law." *Id.* When performing this review, appellate courts "must defer to the fact finder's determination of the weight and credibility to give the testimony and the evidence at trial." *See id.*

As set out above, some evidence was presented during the trial indicating that Osiel initiated the physical confrontation. *See Lewis v. State*, No. 01-08-00604-CR, 2009 WL 1813132, at *5 (Tex. App.—Houston [1st Dist.] June 25, 2009, no pet.) (mem. op., not designated for publication) (observing that "when a defendant initiates the criminal episode, the victim's subsequent acts of violence do not constitute adequate cause from which sudden passion may arise"). Moreover, testimony was presented at trial demonstrating that other people at the taco stand intervened and stopped the fight between Osiel and Castillo shortly after Osiel was either knocked or fell to the ground and after Osiel was kicked in the head, that Osiel "calmly" walked to his truck to retrieve a handgun after getting up, that Castillo did not attempt to further engage with Osiel, that Castillo did not have a weapon, that Castillo went to pay for his tacos, that Osiel walked back to the front of the taco stand, and that Osiel fired multiple shots at Castillo. Similarly, the portions of the recordings

17

published to the district court regarding the events that occurred after the fight started show that Osiel walked to his car after the fighting ceased, that Osiel was not pursued by Castillo, that Osiel returned to the front of the taco stand approximately one minute later before opening fire and killing Castillo, and that Osiel ran back to his truck before driving away.

In addition, although Juventino testified that Osiel was angry and humiliated because of the fight with Castillo and although Resendis testified that Osiel seemed confused when he returned home, no testimony was introduced indicating that Osiel was in "an extreme emotional and psychological state" at the time of the offense. *See Dukes v. State*, 486 S.W.3d 170, 180 (Tex. App.—Houston [1st Dist.] 2016, no pet.); *see also Mason v. State*, No. 06-17-00196-CR, 2018 WL 2027172, at *5 (Tex. App.—Texarkana May 2, 2018, pet. ref'd) (mem. op., not designated for publication) (explaining that defendant's testimony that "I was sort of angry but I was scared too" did not demonstrate that defendant "acted out of terror, rage, or resentment" and concluding based on this and other evidence that "the trial court could have concluded that [the defendant] was capable of cool reflection and did not act out of sudden passion" (internal footnote omitted)).

Based on the preceding, we must conclude that the first prong of the legal-sufficiency standard of review is satisfied because some evidence exists indicating that Osiel was not under the immediate influence of sudden passion when he shot Castillo. *See Riley v. State*, No. 06-10-00130-CR, 2012 WL 5866651, at *6 (Tex. App.—Texarkana Nov. 20, 2012, no pet.) (mem. op., not designated for publication) (determining that evidence was legally sufficient to support jury's rejection of sudden passion, in part, because evidence showed that defendant "ran to his car" after fight broke out and when "security guards sprayed pepper spray" before making "the conscious decision to

18

return to Expo Hall with his weapon" and because jury could have determined that "a person of ordinary temperament would have left the scene," particularly where testimony established "that no one was cornering [defendant] while he was at his vehicle"); *see also Lewis*, 2009 WL 1813132, at *5, *6 (concluding that trial court did not err by denying request for instruction on sudden passion and noting that "[n]ot all testimony that a defendant is angry or dazed entitles a defendant to a sudden passion instruction" and that "[a]ppellant's actions of leaving a fight, retrieving a rifle, returning to the fight scene, and shooting a friend repeatedly as he lies helplessly in the seat of a car do not constitute an objectively common response in an ordinary reasonable person"). In light of that determination, we need not address the second prong and conclude that the evidence is legally sufficient to support the district court's negative finding on sudden passion.

For all the reasons previously given, we overrule Osiel's sole issue on appeal.

## CONCLUSION

Having overruled Osiel's sole issue on appeal, we affirm the district court's judgments of conviction.

---

David Puryear, Justice

Before Justices Puryear, Goodwin, and Bourland

Affirmed

Filed: December 7, 2018

Do Not Publish