# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-22-00255-CR

**Damon Boyd, Appellant**

**v.**

**The State of Texas, Appellee**

## FROM THE 427TH DISTRICT COURT OF TRAVIS COUNTY
### NO. D-1-DC-20-300329, THE HONORABLE TAMARA NEEDLES, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

Following a bench trial, Damon Boyd was convicted of murder and sentenced to five years' imprisonment. *See* Tex. Penal Code §§ 12.32, 19.02. On appeal, Boyd contends that the evidence was insufficient to support the trial court's rejection of his self-defense claim. We will affirm the trial court's judgment of conviction.

## BACKGROUND

In February 2020, Boyd was experiencing homelessness and living in a camp off a highway in south Austin, Texas, along with the following individuals: brothers Brian and Scott Herl, who were unrelated to Boyd, and Boyd's girlfriend Dana Stidham. A few weeks earlier, Shawn Eaton and his girlfriend had been living at the camp, but the other residents asked them to leave. When Eaton was asked to leave, he sold his tent to Boyd and left some of his belongings behind.

On February 23, 2020, Brian reported to the police that he discovered a dead body in the camp. The police went to the scene and found Eaton's body underneath a mattress, a tarp, and bicycle tires. The police noticed that one of Eaton's hands was on top of a martial arts weapon called a sai, which is a dagger with two prongs curving outward from the hilt. During their investigation, the police learned that Eaton had been shot in the chest and discovered a .32 caliber cartridge near Eaton's feet and live rounds of ammunition of the same caliber inside Boyd's tent. After learning that Boyd left the camp to stay with a friend named Nicole Fisher, the police went to Fisher's home and arrested Boyd. Boyd was charged with murdering Eaton.

During the trial, the following witnesses testified: three police officers, including Officer Rae Egan, who testified regarding the investigation in this case; the medical examiner, who testified that Eaton had methamphetamine and methadone in his system and died from a gunshot wound to the chest, but the examiner was unable to ascertain how far the weapon was from Eaton at the time of the shooting; Stidham, Scott, and Brian, who testified regarding their observations at the time of the shooting; Fisher, who testified about events after the shooting; Stidham's friend, who testified that he heard the gunshot while he was on the phone with Stidham discussing how Boyd and Stidham got into an argument earlier that day; and Boyd, who admitted that he shot Eaton but claimed it was in self-defense.

In her testimony, Stidham explained that she lived with Boyd in a tent at the camp, that everyone at the camp used methamphetamine, and that methamphetamine makes people anxious and paranoid. Regarding Eaton, Stidham related that the camp residents asked him to leave because he was stealing from them and had been violent with his girlfriend. Although Stidham related that she was friends with Eaton, she said that she tried not to have contact with him after he left the camp; however, she testified that he kept trying to contact her,

2

showed up at the camp even after being asked to leave, and would sometimes cause problems when he returned. Stidham related that Eaton would hang around her tent and try to see her naked or having sex. She noticed Eaton's bicycle and backpack at the camp before the day of the shooting. In addition, Stidham said that Eaton and Boyd "butted heads" before Eaton left the camp.

Regarding the day of the shooting, Stidham testified that she saw Eaton walk into the camp and then heard Eaton and Boyd arguing for a few seconds before she heard one gunshot. Stidham related that she ran to where Eaton and Boyd were, saw Eaton on the ground having difficulty breathing, and noticed that Boyd was holding his .32 caliber gun. Additionally, Stidham related that no one contacted the police for several days, that she stayed at the camp while the body was there, that Boyd left the camp after the shooting, and that she never saw the gun again. Although Stidham testified that she told one of the investigating officers that Boyd said he shot Eaton to protect her, she also explained that Boyd did not tell her what happened and that she did not feel threatened by Eaton that day.

Next, Scott testified that Eaton had been voted out of the camp for stealing but returned on the day in question to retrieve his backpack, and Scott related that Eaton sometimes carried "a karate knife or a sword." Regarding the incident, Scott explained that he heard Boyd tell Eaton "[s]top" three or four times before the gunshot occurred, and Scott related that he interpreted Boyd's comments as cries for help from the other camp residents. Further, Scott recalled that he went to Boyd's tent and saw Eaton bleeding, having difficulty breathing, and being supported by another camper but saw Boyd in front of his tent "standing there in shock" while holding a gun. Additionally, Scott testified that no one moved Eaton but that someone placed a mattress over him.

3

Moreover, Scott said that he and the other residents tried to get Boyd to call 911 with his cell phone but that Boyd just stood there in shock. Scott also related that when the police arrived a few days later, he was surprised and disappointed to learn that Boyd never called the police. When describing Eaton, Scott testified that Eaton was not known for carrying weapons and that he had never seen Eaton being violent with anyone. Although Scott testified that he did not see Eaton holding a weapon, he saw a weapon on the ground near Eaton and believed that Eaton brought the weapon to the camp and had the intent to hurt someone. When describing Boyd, Scott stated that Boyd "[s]ometimes" had a short temper.

After his brother Scott finished testifying, Brian related that Eaton had been asked to leave the camp because he stole from the residents and that Eaton returned to the camp multiple times despite being told to stay away. Regarding the incident, Brian recalled that it happened on February 21, 2020, and that he heard Boyd say "[g]et out of here" four times in a row before hearing a single gunshot. Further, Brian testified that he went to Boyd's tent; that Eaton was still alive but died quickly; that Boyd said, "I can't believe I did it"; and that Boyd admitted to shooting Eaton because Eaton would not leave but claimed he did not want to shoot Eaton. When describing the scene, Brian stated that Boyd and Eaton were five or six feet apart and that there was a martial arts weapon near Eaton's hand on the ground. Although Brian stated that he never saw Eaton engage in violent behavior and admitted that he did not see the incident, he testified that Boyd was forced to shoot because Eaton had a weapon. Moreover, Brian explained that he told people at the camp to call 911, that he left the camp that day for work, that he returned the following day, that no one had called 911 at that point, and that Boyd left the camp that day.

4

Boyd's friend Fisher testified that on February 22, 2020, Boyd told her that he wanted to leave the camp and that she agreed to pick him up. Fisher related that when she picked Boyd up, he said that he shot someone and seemed distraught about it but did not elaborate any further. Further, Fisher testified that Boyd spent the night at her house, that she encouraged him to go to the police, and that he agreed; however, Fisher related that the police showed up at her house shortly thereafter and took him into custody.

Next, Officer Egan testified that she documented the scene where the incident occurred. When describing the scene, Officer Egan recalled that a .32 caliber cartridge had been covered with bicycle tires near Eaton's feet and that there was a sai under Eaton's left arm. Regarding the sai, Officer Egan initially testified that using it to stab someone could cause death or serious bodily injury and explained that it could have looked like a deadly weapon from a distance. However, Officer Egan later clarified that the sai was very lightweight and that from up close, it looked like a toy and not a deadly weapon. Further, Officer Egan testified that the sai was not capable of causing serious bodily injury but speculated that it could have injured someone if it was used to poke an eye. In addition, Officer Egan said that although the police searched the camp, they did not find the gun used in the shooting. During Officer Egan's testimony, the sai and pictures showing where it was discovered were admitted into evidence.

Finally, Boyd testified that Eaton was violent with his girlfriend when he lived at the camp, that Eaton was asked to leave, that he bought Eaton's tent when Eaton left, that Eaton left some of his property behind, and that Eaton returned to the camp multiple times after being asked to leave. Regarding the incident, Boyd said that he was outside of his tent, that he noticed Eaton moving quickly and purposefully toward him, that Eaton looked mad, that Eaton had an unknown metal object in his hand, and that Eaton said to Boyd that he was "going to kill you,

5

motherfucker." Boyd speculated that Eaton may have been high but admitted that he did not know that. Next, Boyd stated that he told Eaton to "Stop. Get back. Go. Get out of here. Stop." Further, Boyd testified that Eaton continued to move toward him, that he was afraid that Eaton was going to stab him with the metal object, that he had no opportunity to do anything other than defend himself, and that he shot Eaton.

When discussing the shooting, Boyd related that his actions were necessary, that he felt like he would have been seriously injured if he did not act, that he believed Eaton was holding a deadly weapon, that he was afraid for his life, and that he shot Eaton approximately one minute after seeing Eaton arrive at the camp. In his testimony, Boyd admitted that he used methamphetamine that day, that methamphetamine makes him anxious and affects his decision-making, that he had argued with Stidham earlier, and that he did not call the police because he was scared of being arrested and because he was high. Discussing Eaton, Boyd related that he had never seen Eaton act that way before, that he had no issue with Eaton before that day, and that he did not attempt to deescalate the situation by directing Eaton to drop the weapon or pointing the gun at Eaton without shooting and telling him to leave. Moreover, Boyd testified that after the shooting he dropped the weapon at the camp and spent the night there.

After considering the evidence presented, the trial court found Boyd guilty of murder and sentenced him to five years' imprisonment.

**DISCUSSION**

In his issue on appeal, Boyd contends that the evidence was insufficient to support the trial court's rejection of his self-defense claim. As support, Boyd highlights his testimony that Eaton came toward him in a quick and aggressive manner, that Eaton continued to approach despite his telling Eaton to stop multiple times, that Eaton was holding a metal object in his hand

6

that Boyd believed was a weapon, that Eaton threatened to kill him, and that he believed he had to respond with deadly force to avoid being killed or seriously injured. Boyd also refers to the testimony from Scott and Brian asserting that they heard Boyd tell Eaton to stop moving toward him and that they saw a weapon on the ground near Eaton's hand. Further, Boyd highlights that Scott testified that he construed Boyd's yelling as a cry for help and believed Eaton came to the camp with the intent to hurt someone and had a weapon and that Brian testified that Eaton and Boyd were five to six feet apart at the time of the shooting. Next, Boyd notes that Officer Egan initially seemed to indicate that the sai could have been used as a deadly weapon. Moreover, Boyd argues that the photographs of the sai showed that the weapon resembled a dagger that was several inches long, had a pointed shape, and was capable of causing death or serious bodily injury. *See* Tex. Penal Code § 1.07(a)(17) (defining deadly weapon); *Brickley v. State*, 623 S.W.3d 68, 76 (Tex. App.—Austin 2021, pet. ref'd) (listing factors courts can consider when determining whether object is capable of causing death or serious bodily injury). Accordingly, Boyd contends that the weapon was a deadly weapon or, alternatively, that he reasonably believed that it was a deadly weapon justifying his use of deadly force. For these reasons, Boyd urges that the evidence was insufficient to support the trial court's rejection of his self-defense claim.[1]

Under the Penal Code, a person commits murder if he "intentionally or knowingly causes the death of an individual." Tex. Penal Code § 19.02(b)(1). The Penal Code also

---

[1] In his brief, Boyd points to various appellate court decisions determining that the evidence was sufficient to reject a self-defense theory but asserts that unlike those cases, the evidence pertaining to self-defense here had no inconsistencies from which the trial court could have determined that he did not act in self-defense. However, as set out in the opinion, we conclude that there was sufficient evidence from which the trial court could reject his self-defense claim.

7

specifies that "[i]t is a defense to prosecution that the conduct in question is justified under" chapter nine. *Id.* § 9.02. One justification listed in that chapter is self-defense, which provides that "a person is justified in using force against another when and to the degree the actor reasonably believes the force is immediately necessary to protect the actor against the other's use or attempted use of unlawful force." *Id.* § 9.31(a). "The use of force against another is not justified . . . in response to verbal provocation alone." *Id.* § 9.31(b)(1).

Moreover, the use of deadly force is only justified in the circumstances set out by the Penal Code. *Id.* § 9.31(d). Of significance to this case, "[a] person is justified in using deadly force against another . . . if the actor would be justified in using force against the other" as set out above and "when and to the degree the actor reasonably believes the deadly force is immediately necessary . . . to protect the actor against the other's use or attempted use of unlawful deadly force." *Id.* § 9.32(a). "A person has the right to defend himself from apparent danger to the same extent as he would if the danger were real." *Dugar v. State*, 464 S.W.3d 811, 818 (Tex. App.—Houston [14th Dist.] 2015, pet. ref'd) (quoting *Hamel v. State*, 916 S.W.2d 491, 493 (Tex. Crim. App. 1996)). Accordingly, "under certain circumstances, a person may use deadly force against another, even if the other was not actually using or attempting to use unlawful deadly force." *Id.* "The reasonableness of a person's belief that force is immediately necessary is viewed from the person's standpoint at the time that he acted." *Id.* "[A] 'reasonable belief' is one that would be held by an ordinary and prudent person." *See Mays v. State*, 318 S.W.3d 368, 385 (Tex. Crim. App. 2010).

"Evidence is sufficient to support a criminal conviction if a rational [factfinder] could find each essential element of the offense beyond a reasonable doubt." *Stahmann v. State*, 602 S.W.3d 573, 577 (Tex. Crim. App. 2020) (citing *Jackson v. Virginia*, 443 U.S. 307, 319

8

(1979)). In making this determination, "[w]e view the evidence in the light most favorable to the verdict and consider all of the admitted evidence, regardless of whether it was properly admitted." *Id*. "The [factfinder] is the sole judge of credibility and weight to be attached to the testimony of the witnesses." *Id*. Factfinders "can draw reasonable inferences from the evidence so long as each inference is supported by the evidence produced at trial," *id*., and are "free to apply common sense, knowledge, and experience gained in the ordinary affairs of life in drawing reasonable inferences from the evidence," *Eustis v. State*, 191 S.W.3d 879, 884 (Tex. App.—Houston [14th Dist.] 2006, pet. ref'd). "When the record supports conflicting inferences, we presume that the [factfinder] resolved the conflicts in favor of the verdict and defer to that determination." *Merritt v. State*, 368 S.W.3d 516, 525-26 (Tex. Crim. App. 2012).

Appellate courts must "determine whether the necessary inferences are reasonable based upon the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict." *Hooper v. State*, 214 S.W.3d 9, 16-17 (Tex. Crim. App. 2007). Furthermore, appellate courts presume that conflicting inferences were resolved in favor of the conviction and "defer to that determination." *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). Courts also must bear in mind that "direct and circumstantial evidence are treated equally" and that "[c]ircumstantial evidence is as probative as direct evidence in establishing the guilt of an actor" and "can be sufficient" on its own "to establish guilt." *Kiffe v. State*, 361 S.W.3d 104, 108 (Tex. App.—Houston [1st Dist.] 2011, pet. ref'd). The evidence is legally insufficient if "the record contains no evidence, or merely a 'modicum' of evidence, probative of an element of the offense" or if "the evidence conclusively establishes a reasonable doubt." *Id.* at 107 (quoting *Jackson*, 443 U.S. at 320).

"The defendant has the initial burden of production and must bring forth some evidence to support" his claim of self-defense. *See Dearborn v. State*, 420 S.W.3d 366, 372 (Tex. App.—Houston [14th Dist.] 2014, no pet.). "Once the evidence is produced, the State bears the burden of persuasion to disprove the defense." *Id.* "This burden does not require the production of additional evidence rebutting self-defense; it requires the State to prove its case beyond a reasonable doubt." *Id.* "When the trier of fact finds the defendant guilty, there is an implicit finding rejecting the defendant's self-defense theory." *Id.* "Because the State bears the burden of persuasion to disprove a" claim of self-defense "by establishing its case beyond a reasonable doubt, we review . . . sufficiency challenges to the . . . rejection of such a defense under" the legal-sufficiency standard. *See Smith v. State*, 355 S.W.3d 138, 145 (Tex. App.—Houston [1st Dist.] 2011, pet. ref'd); *cf. Brooks v. State*, 323 S.W.3d 893, 895 (Tex. Crim. App. 2010) (providing that "legal-sufficiency standard is the only standard that a reviewing court should apply in determining whether the evidence is sufficient to support each element of a criminal offense").

When addressing a claim that the evidence was legally insufficient to support the rejection of a self-defense claim, appellate courts "examine all of the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found beyond a reasonable doubt (1) the essential elements of the alleged offenses, and (2) against appellant on the self-defense issue." *Dearborn*, 420 S.W.3d at 372. The trier of fact "is the sole judge of the credibility of the witnesses and the weight to be given their testimony." *Id.* at 372-73. Accordingly, "[t]he trier of fact is free to accept or reject defensive evidence on the issue of self-defense," and appellate courts "presume the trier of fact resolved any conflicting inferences and issues of credibility in favor of the judgment." *Id.* at 373. "Moreover, when there is evidence,

if believed, to support a claim of self-defense, but other evidence, if believed, to support a conviction, an appellate court will not weigh in on this fact-specific determination as this is a function of" the trier of fact. *See McFadden v. State*, 541 S.W.3d 277, 285 (Tex. App.—Texarkana 2018, pet. ref'd).

Although Boyd references evidence that he suggests supports his claim of self-defense, other evidence was presented from which the trial court could reasonably infer that Boyd did not act in self-defense. *See Chiles v. State*, 988 S.W.2d 411, 415 (Tex. App.—Houston [1st Dist.] 1999, pet. ref'd) (noting that it is for factfinder to resolve inconsistencies in evidence). As an initial matter, we note that Boyd admitted that he shot at and killed Eaton. Moreover, although Officer Egan initially seemed to indicate that the sai could have been used as a deadly weapon, she later clarified her earlier testimony to say that the sai was not a deadly weapon because it was not capable of causing serious bodily injury or death. Even though Officer Egan testified that the sai could have looked like a deadly weapon from far away, she stated that it did not look like one when viewed up close. In fact, Officer Egan testified that the sai looked like a toy and described it as very light, and the trial court was able to observe the object at trial. As Boyd points out, Brian testified that Boyd and Eaton were five or six feet apart, and the trial court could have reasonably inferred that from that distance the toy-like nature of the object would have been apparent to Boyd.

In addition, although Stidham and Boyd testified that Eaton had been violent with his girlfriend, both Brian and Scott testified that they had not seen Eaton being violent with anyone. *See Perales v. State*, 622 S.W.3d 575, 582 (Tex. App.—Houston [14th Dist.] 2021, pet. ref'd) (explaining that factfinder "was free to disregard appellant's self-serving testimony"); c*f. Seidule v. State*, 622 S.W.3d 480, 490 (Tex. App.—Houston [14th Dist.] 2021, no pet.)

11

(explaining that evidence of victim's violent nature can support claim of self-defense). Further, Scott described Boyd as having a short temper, and Stidham testified that Boyd and Eaton had argued before. *See Elmore v. State*, 257 S.W.3d 257, 259 (Tex. App.—Houston [1st Dist.] 2008, no pet.) (noting that evidence regarding "prior disagreements" between defendant and victim supported determination that defendant was not entitled to self-defense instruction). Additionally, Boyd admitted that he argued with Stidham prior to the shooting, that he used methamphetamine that day, and that methamphetamine causes him to be anxious and affects his decision making. *See Compton v. State*, No. 05-07-01165-CR, 2008 WL 2502165, at *5-6 (Tex. App.—Dallas June 23, 2008, pet. ref'd) (op., not designated for publication) (noting that defendant used drugs prior to killing victim when determining that evidence was sufficient to support conviction and rejection of self-defense claim); *see also Capteillo v. State*, No. 04-19-00025-CR, 2020 WL 5802959, at *4 (Tex. App.—San Antonio Sept. 30, 2020, pet. ref'd) (mem. op., not designated for publication) (emphasizing that defendant was "already angry" before incident in which he claimed to be acting in self-defense). Additionally, although Boyd and other witnesses testified that he told Eaton to stop and to leave, Boyd admitted that he shot Eaton within a minute of seeing Eaton and did not try to diffuse the situation by pointing the gun at Eaton and directing him to leave before shooting Eaton, and none of the other witnesses testified that they heard the threat that Boyd claimed Eaton made to kill him. *Cf. Saxton v. State*, 804 S.W.2d 910, 911, 914 (Tex. Crim. App. 1991) (determining that evidence was sufficient to reject self-defense theory even though defendant was only witness to offense).

Moreover, the evidence regarding Boyd's conduct after the shooting was inconsistent with his claim of self-defense. *See Aguilar-Motino v. State*, No. 01-08-00527-CR, 2009 WL 3321418, at *3 (Tex. App.—Houston [1st Dist.] Oct. 15, 2009, pet. ref'd) (mem. op.,

not designated for publication) (highlighting evidence of defendant's conduct after stabbing victim when concluding that jury could reasonably decide that defendant committed aggravated assault and reject self-defense claim). Even though Stidham, Brian, and Scott testified that Eaton was alive when they arrived, no witness testified that Boyd undertook any effort to provide help for Eaton; on the contrary, despite testimony from witnesses explaining that they asked Boyd to call 911, the evidence established that Boyd never called 911, and Boyd admitted that he did not call for help because he was afraid of being arrested. *See Eisenman v. State*, No. 13-05-00705-CR, 2008 WL 2515877, at *8 (Tex. App.—Corpus Christi-Edinburg Jan. 10, 2008, pet. ref'd) (mem. op., not designated for publication) (noting in sufficiency analysis that defendant "did not immediately call 911 . . . after allegedly shooting [victim] in self-defense").

Similarly, the testimony from multiple witnesses demonstrated that Boyd left the scene after the shooting. *See Kirk v. State*, 421 S.W.3d 772, 781 (Tex. App.—Fort Worth 2014, pet. ref'd) (highlighting flight from scene as evidence jury could consider when rejecting self-defense claim). Finally, despite efforts by police to search the camp for the gun, the gun was never recovered, and Stidham testified that she never saw the gun again in the camp. The trial court could have reasonably disregarded Boyd's testimony that he dropped the gun and inferred that Boyd disposed of the weapon in an effort to avoid being charged in this case. *Cf. Valverde v. State*, 490 S.W.3d 526, 529 (Tex. App.—San Antonio 2016, pet. ref'd) (highlighting that jury could have considered defendant's efforts to dispose of weapon when rejecting his self-defense claim).

Viewing the evidence in the light most favorable to the verdict, the trial court could have reasonably concluded that Boyd intentionally or knowingly caused the death of Eaton by shooting Eaton and that Boyd did not reasonably believe that the use of deadly force was

13

necessary to protect himself from Eaton's use or attempted use of unlawful deadly force and, therefore, rejected the self-defense claim. *See Hill v. State*, 99 S.W.3d 248, 253 (Tex. App.—Fort Worth 2003, pet. ref'd); *see also Wilkerson v. State*, 881 S.W.2d 321, 324 (Tex. Crim. App. 1994) (explaining that factfinder is free to accept or reject any or all evidence from either party); *Mendez v. State*, 515 S.W.3d 915, 921-22 (Tex. App.—Houston [1st Dist.] 2017) (concluding that evidence was sufficient to support rejection of self-defense claim after explaining that defendant ignored evidence refuting self-defense), *aff'd*, 545 SW.3d 548 (Tex. Crim. App. 2018). Accordingly, we conclude that the evidence was sufficient to support the trial court's rejection of Boyd's self-defense claim and to support his conviction.

For these reasons, we overrule Boyd's issue on appeal.

## CONCLUSION

Having overruled Boyd's issue on appeal, we affirm the trial court's judgment of conviction.

_____

Thomas J. Baker, Justice

Before Justices Baker, Smith, and Jones[*]

Affirmed

Filed: April 21, 2023

Do Not Publish

[*]Before J. Woodfin Jones, Chief Justice (Retired), Third Court of Appeals, sitting by assignment. *See* Tex. Gov't Code § 74.003(b).