# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

### NO. 03-23-00500-CR

---

**Branden L. Smith, Appellant**

**v.**

**The State of Texas, Appellee**

---

**FROM THE 26TH DISTRICT COURT OF WILLIAMSON COUNTY**
**NO. 21-1196-K26, THE HONORABLE DONNA GAYLE KING, JUDGE PRESIDING**

---

### M E M O R A N D U M   O P I N I O N

A jury found Branden L. Smith guilty of murder and assessed sentence at 75 years in prison. The trial court also assessed a $10,000 fine. Appellant contends that the evidence was insufficient to support the jury's rejection of his self-defense claim and that the trial court erred by overruling his objection to the State's question about whether he had "prison shanked" his victim. We will affirm the judgment.

### BACKGROUND

Ayrica Andrews died from 15 stab and slice wounds inflicted by Appellant during an argument in an apartment. Appellant admitted in testimony to stabbing Andrews but said that Andrews had pointed a shotgun at him and made him fear for his life. He said that he did not intend to kill Andrews and that he used the knife defensively. He testified that he panicked or blacked out while stabbing her.

No other witness corroborated Appellant's assertion that Andrews held the shotgun. Eyewitnesses agreed that a shotgun had been in the apartment, though their testimony was inconsistent as to its location and presence in the apartment when the stabbing occurred. They said they did not see Andrews pick up the gun but conceded that Appellant blocked their view of Andrews at times; when one witness was asked if Andrews might have picked up the gun without her seeing, she said, "I mean, I guess so."

After Appellant said he killed Andrews with a pocketknife, the prosecutor on cross-examination asked Appellant, "You prison-shanked her, didn't you?" The court overruled Appellant's objection that the question was argumentative. Appellant responded, "No," and said, "I've never had a prison shank." He admitted that he had been convicted of a felony and was sent to prison.

**DISCUSSION**

Appellant contends that the jury's implicit rejection of his self-defense claim was not supported by sufficient evidence. He also contends that the trial court committed harmful error by overruling Appellant's objection to the prosecutor's use of the term "prison shanked" in a question.

**I.     Sufficient evidence supports the jury's rejection of Appellant's self-defense claim.**

**A.  The applicable law**

A person commits murder if he "intentionally or knowingly causes the death of an individual." Tex. Penal Code § 19.02(b)(1). The Penal Code specifies that "[i]t is a defense to prosecution that the conduct in question is justified under" Chapter Nine. *Id.* § 9.02. "[A] person is justified in using force against another when and to the degree the actor reasonably

believes the force is immediately necessary to protect the actor against the other's use or attempted use of unlawful force." *Id.* § 9.31(a). "The use of force against another is not justified . . . in response to verbal provocation alone." *Id.* § 9.31(b)(1).

The use of deadly force is justified only in the circumstances set out by the Penal Code. *Id.* § 9.31(d). Of significance to this case, "[a] person is justified in using deadly force against another . . . if the actor would be justified in using force against the other" as set out above and "when and to the degree the actor reasonably believes the deadly force is immediately necessary . . . to protect the actor against the other's use or attempted use of unlawful deadly force." *Id.* § 9.32(a). The use of force is not justified if the actor provoked the other's use or attempted use of unlawful force unless: (A) the actor abandons the encounter, or clearly communicates to the other his intent to do so reasonably believing he cannot safely abandon the encounter, and (B) the other nevertheless continues or attempts to use unlawful force against the actor. *Id*. § 9.32(b)(4). "The reasonableness of a person's belief that force is immediately necessary is viewed from the person's standpoint at the time that he acted." *Dugar v. State*, 464 S.W.3d 811, 818 (Tex. App.—Houston [14th Dist.] 2015, pet. ref'd). "[A] 'reasonable belief' is one that would be held by an ordinary and prudent person." *Mays v. State*, 318 S.W.3d 368, 385 (Tex. Crim. App. 2010).

"The defendant has the initial burden of production and must bring forth some evidence to support" his claim of self-defense. *See Dearborn v. State*, 420 S.W.3d 366, 372 (Tex. App.—Houston [14th Dist.] 2014, no pet.). "Once the evidence is produced, the State bears the burden of persuasion to disprove the defense." *Id.* "This burden does not require the production of additional evidence rebutting self-defense; it requires the State to prove its case beyond a reasonable doubt." *Id.* "When the trier of fact finds the defendant guilty, there is an

implicit finding rejecting the defendant's self-defense theory." *Id.* "Because the State bears the burden of persuasion to disprove a" claim of self-defense "by establishing its case beyond a reasonable doubt, we review . . . sufficiency challenges to the . . . rejection of such a defense under" the legal-sufficiency standard. *See Smith v. State*, 355 S.W.3d 138, 145 (Tex. App.— Houston [1st Dist.] 2011, pet. ref'd); *cf. Brooks v. State*, 323 S.W.3d 893, 895 (Tex. Crim. App. 2010) (plurality op.) (providing that "legal-sufficiency standard is the only standard that a reviewing court should apply in determining whether the evidence is sufficient to support each element of a criminal offense").

"Evidence is sufficient to support a criminal conviction if a rational jury could find each essential element of the offense beyond a reasonable doubt." *Stahmann v. State*, 602 S.W.3d 573, 577 (Tex. Crim. App. 2020) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). In making this determination, "[w]e view the evidence in the light most favorable to the verdict and consider all of the admitted evidence, regardless of whether it was properly admitted." *Id.* "The jury is the sole judge of credibility and weight to be attached to the testimony of the witnesses." *Id.* Factfinders "can draw reasonable inferences from the evidence so long as each inference is supported by the evidence produced at trial," *id.*, and are "free to apply common sense, knowledge, and experience gained in the ordinary affairs of life in drawing reasonable inferences from the evidence," *Eustis v. State*, 191 S.W.3d 879, 884 (Tex. App.— Houston [14th Dist.] 2006, pet. ref'd). "When the record supports conflicting inferences, we presume that the jury resolved the conflicts in favor of the verdict and defer to that determination." *Merritt v. State*, 368 S.W.3d 516, 525-26 (Tex. Crim. App. 2012). The jury may believe all, some, or none of the testimony presented. *Heiselbetz v. State*, 906 S.W.2d 500, 504 (Tex. Crim. App. 1995).

4

Appellate courts must "determine whether the necessary inferences are reasonable based upon the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict." *Hooper v. State*, 214 S.W.3d 9, 16-17 (Tex. Crim. App. 2007). Furthermore, appellate courts presume that conflicting inferences were resolved in favor of the conviction and "defer to that determination." *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). Courts also must bear in mind that "direct and circumstantial evidence are treated equally" and that "[c]ircumstantial evidence is as probative as direct evidence in establishing the guilt of an actor" and "can be sufficient" on its own "to establish guilt." *Kiffe v. State*, 361 S.W.3d 104, 108 (Tex. App.—Houston [1st Dist.] 2011, pet. ref'd). The evidence is legally insufficient if "the record contains no evidence, or merely a 'modicum' of evidence, probative of an element of the offense" or if "the evidence conclusively establishes a reasonable doubt." *Id.* at 107 (quoting *Jackson*, 443 U.S. at 320).

When addressing a claim that the evidence was legally insufficient to support the rejection of a self-defense claim, appellate courts "examine all of the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found beyond a reasonable doubt (1) the essential elements of the alleged offenses, and (2) against appellant on the self-defense issue." *Dearborn*, 420 S.W.3d at 372. The trier of fact "is the sole judge of the credibility of the witnesses and the weight to be given their testimony." *Id.* at 372-73. Accordingly, "[t]he trier of fact is free to accept or reject defensive evidence on the issue of self-defense," and appellate courts "presume the trier of fact resolved any conflicting inferences and issues of credibility in favor of the judgment." *Id.* at 373. "Moreover, when there is evidence, if believed, to support a claim of self-defense, but other evidence, if believed, to support a conviction, an appellate court will not weigh in on this fact-specific determination as

5

this is a function of" the trier of fact. *See McFadden v. State*, 541 S.W.3d 277, 285 (Tex. App.—Texarkana 2018, pet. ref'd).

## B. Testimony and evidence

Appellant's self-defense claim centers on his testimony that Andrews pointed the shotgun at him and the inconsistency of other witnesses' testimony about the location of the shotgun and their view of the stabbing. We will focus our recitation on the testimony of the eyewitnesses: Donna, Simone, and Appellant, and the autopsy report and tests of the shotgun.

### 1. Donna

Donna testified that she and her daughter, Simone, were living in the apartment. They were joined by Lashay—Simone's daughter and Donna's granddaughter—during school breaks, and by Lashay's friend, Andrews. Appellant was dating Simone and Donna testified that Appellant would occasionally stay in the apartment and often left a "big gun" in the living room. Donna slept in the bedroom, Simone had a bed set up in the dining area, and Lashay and Andrews would stay either in the large walk-in closet or the garage. Donna said there were no major problems that she was aware of. She said that Andrews did not like Appellant but she did not know why; she did not remember telling a police detective that the dislike was because of the way he treated Simone. Donna said, " I stayed in my room."

Donna testified that on July 20, 2021, she and Simone made Instacart deliveries in the afternoon. When they returned to the apartment between 4 and 5 p.m., Lashay was at a store buying food, and Andrews was watching television on the couch in the living room. Appellant arrived as Donna was going to her room. Simone was in the bathroom with the door ajar across a hall from Donna's bedroom. Appellant spoke to Simone about watching a game on TV, and

6

Andrews thought he was talking to her. Appellant and Andrews exchanged words and she did not hear Andrews threaten Appellant. Donna said the conversation escalated and their voices got elevated. When she was drawn to the living room by the loud voices, Appellant and Andrews were face-to-face near the TV and the coffee table that was in front of the couch.

Donna said she went near the coffee table to try to get her small dog. Donna said she was about ten feet from the arguing pair. She saw no weapons. She said Simone tried to intervene but Appellant pushed her away, then Andrews pushed her away. Appellant and Andrews moved toward the front door and the dining area/bedroom. She estimated that the argument lasted about ten minutes; she said nobody made any threats or picked up anything.

Donna said she did not see anything in Appellant's hands but said that he blocked her view. She testified that she saw Appellant "punch" Andrews three times in the side (though closer in time to the stabbing she had told victim's services that the blows were to Andrews's stomach). She said that Andrews's back was to the wall by the front door and dining area and that Andrews was trying to fight Appellant off. Andrews rolled to the floor, and Appellant left, saying, "She'll be all right." She did not see him carrying anything, though she could not say for sure. She said he did not return. Donna said that the more physical part of the confrontation had lasted maybe 15 or 20 minutes. They called 911 and Simone administered CPR.

Donna said that Appellant kept his gun in the corner of the apartment in a case or bag against the wall in the dining area, but she was not sure if it was there at the time of the stabbing. She estimated that it was two or three feet long, that it was kept in a black case, and that she never saw it out of the case. She said that the gun was kept near a bedside table at the "back entry" of the dining room away from the front door. Donna said she thought Appellant might have removed the gun the day before, but admitted she might have been mistaken. She

7

insisted no one else would have touched the gun. She said the gun did not come into play and that she did not know if Andrews knew the gun was in the apartment.

**2. Simone**

Simone testified that she and Appellant dated non-exclusively from 2018 to 2021. She said that Andrews and Lashay were usually in the living room of the apartment. She had seen no confrontations or fights among any of the residents of the apartment. She said that on the day of the killing, she did her Instacart deliveries alone. After she returned from making deliveries, Donna was in her room, Andrews was watching TV from the couch, and Simone was in the bathroom with the door open when Appellant returned. She and Appellant intended to watch a basketball game that evening; she wanted to watch at a restaurant.

Simone testified that Appellant said something about not waiting for the TV all day; he wanted to watch the game, but Lashay and Andrews planned to watch the TV. Simone said Andrews made some remark that caused Appellant to leave the bathroom door and go to the living room and argue with Andrews. When Simone left the bathroom, she saw Andrews still lying on the couch and Appellant standing on the other side of the coffee table from her.

The argument escalated, and Simone testified that she tried to get Appellant to go out the front door. Andrews got up from the couch and got in Appellant's face. Simone testified that she got between them and that Appellant pushed her, then Andrews pushed her. Neither had anything in their hands. Simone said she opened the front door and tried to push Appellant out of it, but he declined. Simone said Donna came out of her bedroom and went to the kitchen, banging on the counter to try to stop the argument.

Simone said she ended up in the living room area, with Appellant and Andrews closer to the dining room. She said she could see them from the side. She said that Andrews

8

was "kind of like up on that wall" behind the front door, and that Appellant was right in front of Andrews. Simone said Appellant then started punching Andrews. Simone testified that she was close enough to Appellant that she could not see him holding anything in his hands, which is why she thought he had punched Andrews. She said that if someone had picked up the long shotgun she would have seen it. She said she did not see Andrews defend herself, grab anything, or have anything in her hands. Simone said that she knew that Appellant's blows were not punches after Andrews fell to the floor; Simone saw blood and Andrews's intestines. She saw nothing in Appellant's or Andrews's hands after the stabbing.

Simone said Appellant walked over to the little table in the dining-area bedroom and said, "[S]he's going to be okay." She said Appellant picked up his phone from the table and a laundry bag with his clothes. She estimated that the entire altercation from first words to Appellant's departure took maybe 10 to 15 minutes. She thought the physical confrontation took two to three minutes, but she was not sure because it happened so fast. Simone called 911, which she said took a while to route properly because the apartment complex straddles the county line. She administered CPR, Appellant left, and the police came.

Simone testified that Appellant kept the gun by the wall near where Andrews was standing during the confrontation. She said that the gun might have been there that day or the day before. She did not remember it being in a case. She said that nobody else touched the gun. Simone testified that she did not see it being held during the stabbing. She said that, because of its size, she would have seen if someone picked it up. She said that she did not know what happened to it afterwards but that it was not there when the police arrived. She said that she did not see Appellant carry it out but that she was not paying attention to him while performing CPR on Andrews.

9

Simone testified that she did not see Andrews pick up the gun but, when asked if she may not have noticed Andrews pick it up, Simone said, "I mean, I guess so." She said she told responding officers that Appellant did not have a gun because she forgot about it because it was just in the corner unused every day. She conceded that she had had a handgun but did not know what had happened to it and did not know if it was in Appellant's car. Simone testified that she assumed Appellant must have taken the gun because it was in the apartment before the stabbing and was gone afterwards.

Simone testified that she had wanted Appellant out of the apartment but "not like that." She feared that if she asked him to leave he would damage her property as he had done more than a year before he killed Andrews. Simone said Andrews and Lashay had a strained relationship with Appellant because of Lashay's view of how he treated Simone. Simone testified that Lashay and Andrews did not show malice toward him.

### 3. Autopsy report and other forensic evidence

The medical examiner reported that Andrews suffered 15 sharp force injuries to her chest, abdomen, arms, and back. There were five stab wounds on the left side of her chest, affecting her heart, muscles, pericardial sac, lung, and chest cavity. The abdominal wound affected her stomach, small intestine, abdominal cavity, and soft tissues around her spinal column; the examiner was uncertain if this was two wounds or an incomplete exit and reentrance wound. The stab wound in her back bled along the wound path. Her right forearm had an incised wound and her left forearm had seven incised wounds.

The Department of Public Safety tested the shotgun for fingerprints, blood, and DNA. DPS did not find the victim's fingerprints, blood, or DNA on the shotgun.

10

### 4. Appellant

Appellant admitted to having damaged Simone's property before. He testified that during an argument with Simone he broke her laptop in half with his hands. Two years before, he admittedly slashed Simone's tires and snapped her eyeglasses, but "never threatened to do anything to" harm her. He said that by July 2021, his relationship with Lashay and Andrews was strained because of arguments over his treatment of Simone and over use of the television. He said they would threaten him not to "do anything" to Simone. He testified that he felt that Lashay's threats to rip out his heart and stomp on it were hyperbole but that Andrews threatened to "have her people come and do certain things to not just me but just anybody that is messing with her."

Appellant testified that he had a pump-action shotgun that he had kept in the apartment since 2019 despite being barred by his 2016 felony conviction from possessing a firearm for five years. A police officer testified that the gun was 38 inches long. Appellant said the gun was never in a case or bag. He said he kept it propped up near the entry door near the transition from the living room to the dining-area bedroom. He said that other residents sometimes moved the gun when he was out of town.

Appellant said the gun was in its usual place on July 21, 2021. He planned to watch the NBA championship game that evening. He picked up a sandwich for himself at a store, brought it to the apartment, and put it in the refrigerator. Andrews was on the couch watching TV. He went to talk with Simone in the bathroom about where to watch the basketball game. He denied asking Simone if Andrews was going to watch TV all day, but testified that he said that if they watched the game somewhere else they would not have to wait on the TV all day. He said Andrews started yelling that they were not going to watch the game in the

11

apartment. Appellant walked out to tell Andrews they were planning on watching the game elsewhere. Appellant testified that Andrews transitioned to complaining about broader control issues in the apartment and to say that she did not understand why Donna and Simone let Appellant stay there and have his way.

Appellant testified that Donna and Simone then came out of the bedroom and bathroom to defuse the situation but Andrews kept going on about how she did not like Appellant and what she would do to him. He said Donna went to the kitchen area while Simone came to his side. Appellant said he denied Andrews's accusations and asked her why she was threatening him. He asked her to "think about what she was saying to me and letting her know that I was a grown man when she was making those threats, that she should not do that to me in my own home." He said Andrews was agitated but that he "never got set off by anything." Appellant estimated that the verbal altercation lasted two or three minutes. He said that Andrews jumped off the couch and ran toward him, but Simone jumped in between them and deflected Andrews toward the front door, while the contact also pushed Simone out from between them. Appellant later agreed that he was 5′11″, 220 pounds, and 35 years old and that Andrews was 5′1″, 135 pounds, and 20 years old at the time of her death.

Appellant said that he saw Andrews pick up the shotgun, so he grabbed his knife from his pocket and opened it. When she turned toward him with the gun, which he knew was loaded with a round chambered, he felt that his life was in danger. Appellant estimated that he was six feet from Andrews and said that they stepped toward each other, but he denied pinning her against the wall. He said he had a jolt of adrenaline to stop the confrontation and used his knife to try to get the gun out her hands. He said he freaked out, panicked, or blacked out because he remembered only the first and last times he used the knife against Andrews. He

12

remembered putting the blade into the front of her body twice—the first and last wounds, he said—but did not remember making the other wounds. Appellant said he did not recall Andrews covering up in a defensive posture and surmised that she incurred the wounds to her forearms as she was trying to grab the knife from him. He opined that she must have dropped the gun in order to start grabbing for the knife. He estimated that the physical confrontation took less than 20 seconds, maybe 45 seconds from when Andrews left the couch. He testified that, when Andrews fell to the ground, he said to call 911. He said that he noticed Andrews's intestines partially protruding, checked her pulse, and heard her say "You're still a bitch."

Simone called 911 and talked for about five minutes before she began administering aid. Appellant grabbed the shotgun and his duffle bag; took them to his car; then came back for his keys, phone, and sandwich. He said that the shotgun—which he had testified Andrews dropped so that she could try to grab his knife—was leaning against the foot of the bed in the dining room. He left because he wanted to avoid further drama when Lashay returned to the apartment because he "was already very disgruntled." In addition to wanting to avoid arrest, he said he wanted to reduce the chance of getting Donna and Simone in trouble with the apartment complex for having a non-renter living with them. He drove away from the apartment complex as police and ambulances arrived. He cut behind a business to avoid rush hour traffic.

He drove to another woman's home. He used her bathroom to clean up, clipped his fingernails, and washed some of his blood-stained clothes. He asked the woman if she would go with him to Milwaukee for the NBA basketball championship parade and offered to pay her expenses and reimburse her for lost salary, but she declined. He asked if he could leave the shotgun with her but she declined that request as well. He said he never wiped, cleaned, or removed his gun from the trunk. When she asked him why he did not go home, he testified that

13

he said it was because people were "snitching" on him about violating COVID protocols as a delivery driver to make his life hard. When he got into his car the police arrested him and found the knife in his pocket.

During cross-examination, Appellant admitted he had been to prison for ten months for repeated domestic-violence assaults against women. He said they were all misdemeanors, but the last one was upgraded to a felony because it was his fourth conviction. He reiterated that he did not intend to kill Andrews, only to disarm her, even when he drove the blade into her heart, side, back, and stomach—a wound so deep that it damaged tissue around her spinal cord.

Appellant testified that Donna has reason to lie about the stabbing because "[s]he was mad about what just transpired in her house" and because she did not want him to be with Simone as much. He said Donna and Simone were "interpreting what happened the wrong way" when they described the verbal confrontation as heated on both sides. He said that Simone lied when she said he pushed her. He said that both Simone and Donna missed Andrews picking up the shotgun as well as him pulling out his knife because it happened so fast. He agreed that he did not claim self-defense until he had an attorney.

## C. Application

Appellant argues that the evidence was so inconsistent and contradictory that a rational trier of fact could not have found against him on self-defense beyond a reasonable doubt. He points to conflicts between Donna's testimony and Simone's testimony about the location of the gun, its presence in the apartment during the confrontation, whether it was in a case, and whether Appellant took it (or anything else) with him after the stabbing. He also points to

Donna's admission that her view of Appellant and Andrews was blocked at times and the fact that neither saw him holding a knife.

These conflicts do not require reversal. Although Appellant raises evidence that he suggests supports his claim of self-defense, other evidence was presented from which the jury could reasonably have inferred that Appellant did not act in self-defense. *See Chiles v. State*, 988 S.W.2d 411, 415 (Tex. App.—Houston [1st Dist.] 1999, pet. ref'd) (noting that it is for factfinder to resolve inconsistencies in evidence). The jury assessed the credibility of the witnesses and the record contains sufficient evidence to support the jury's rejection of Appellant's claim of self-defense. The jury could reasonably have looked askance at Appellant's testimony as a whole when he testified that he stabbed Andrews 15 times, then packed his car— including getting his sandwich from the refrigerator—as Simone administered CPR and Andrews died near the front door of the apartment, then immediately drove to his other girlfriend's home to ask her if she wanted to accompany him to an NBA championship parade in Wisconsin. They could reasonably have disbelieved his testimony that he asked the woman to keep the shotgun because he wanted to keep it safe for evidentiary purposes and so he would not be traveling with a loaded gun in the car.

Given Appellant's considerable size advantage over Andrews and the undisputed testimony that the confrontation was heated and verbal but not physical until the fatal stabbing, the jury could have reasoned that Appellant's claim that he reasonably believed that the force he used was immediately necessary to protect himself against Andrews's use or attempted use of unlawful force rests on his uncorroborated testimony that Andrews grabbed the loaded gun, spun, and aimed it at him, causing him to fear for his life. No other evidence supports his view that Andrews grabbed the gun. Donna and Simone testified that they did not see her do so. The

15

jury could weigh Donna's concession that Appellant blocked her view of Andrews and Simone's testimony that the event happened so fast against the 38-inch length of the gun and reasonably conclude that they would have seen Andrews with the shotgun. As the arbiters of credibility, the jury could reject his testimony outright. *See Heiselbetz*, 906 S.W.2d at 504.

Further, the jury saw photos of the amount of blood Andrews shed and could assess whether the shotgun—which Appellant testified he did not wipe or clean after the stabbing—could have tested negative for the victim's blood residue if Appellant had held it when she was stabbed 15 times; the tests also showed an absence of her fingerprints and DNA. The jury could also recall Appellant's testimony that Andrews must have incurred the eight wounds to her forearms because she put the gun down to try to grab the knife from him, then consider his testimony that, after the stabbing, the gun was leaning against the bed. The jury could have decided that Donna's and Simone's testimony that Andrews did not grab and wield the gun was credible, while finding incredible Appellant's version that Andrews grabbed the shotgun and pointed it at him, saw him pull the knife, went and leaned the shotgun against the bed, then tried to grab the knife from him while he was stabbing her. Even if the jury believed Andrews's testimony entirely, they could have determined that he lost his self-defense justification when she leaned the shotgun against the bed; but his stabbing continued.

We conclude that the record contains sufficient evidence to support the jury's rejection of Appellant's self-defense claim.

16

**II.    The court's overruling of Appellant's objection of "argumentative" to the prosecutor's question asserting that Appellant "prison shanked" Andrews was not reversible error.**

**A.  The objection and argument**

Appellant contends that the following excerpt from the prosecutor's cross-examination of him shows the trial court committed reversible error:

> Q.  And the way you did it is with a knife.  It was right up on her, right?
>
> A.  It was with a pocketknife.  Yes.
>
> Q.  Yeah. You prison-shanked her, didn't you?
>
> A.  No.
>
> [Defense counsel]:  Objection, argumentative.
>
> [Prosecutor]: Judge, I'm asking what—the defendant what he did.
>
> THE COURT: Overruled.
>
> Q.  (By Mr. Waldman) You prison-shanked her, didn't you?
>
> A.  No.

Appellant did not object to this question on any other basis.

On appeal, Appellant urges that the question had no probative value and was inflammatory, prejudicial, and misleading—factors of an analysis for exclusion of evidence under Texas Rule of Evidence 403.  He contends that there was no reason to ask the question because Appellant had already admitted to stabbing Andrews and argues that the question unfairly prejudiced him by implying that he had killed someone in prison by stabbing them, saw someone being stabbed, or had some other direct experience with prison stabbing.  Though

Appellant denied such experience, he argues that the damage of injecting that image into the case had already occurred and misled the jury to give undue weight to Appellant's prison time.

## B. Applicable law

To preserve error for appellate review, a party must state the specific grounds upon which the party seeks to exclude the evidence, and the complaint made on appeal must match the objection made at trial. *Thomas v. State*, 723 S.W.2d 696, 700 (Tex. Crim. App. 1986); *see also* Tex. R. App. P. 33.1.

An "argumentative" objection concerns whether counsel is attempting to "argue" the case, not whether the counsel is "arguing" with the witness. *Eddlemon v. State*, 591 S.W.2d 847, 851 (Tex. Crim. App. [Panel Op.] 1979) (trial court did not abuse its discretion or improperly restrict cross-examination by sustaining objection to question "You don't believe your own offense report?" was argumentative).

The rules of appellate procedure require that we disregard non-constitutional errors that do not affect substantial rights. Tex. R. App. P. 44.2(b); *Bagheri v. State*, 119 S.W.3d 755, 763 (Tex. Crim. App. 2003) ("[E]rror is harmless if we have 'fair assurance that the error did not influence the jury, or had but a slight effect.'")

## C. Application

Appellant's objection that the prosecution's question was argumentative did not preserve his appellate complaint that the question was not probative and was inflammatory, unfairly prejudicial, and misleading. *Cf. Clark v. State*, 365 S.W.3d 333, 340 (Tex. Crim. App. 2012) (holding that defense counsel's "badgering, sidebar, argumentative, invading the province

of the jury, and mischaracterization" objections did not preserve due-process complaint for appellate review); *see also* Tex. R. App. P. 33.1(a).

Even if the objection preserved his appellate argument, Appellant has not shown that the question affected his substantial rights. Appellant does not assert an error of constitutional dimension. The fact that Appellant stabbed and cut Andrews 15 times was already in evidence and his prison history separately came into evidence without challenge on appeal. With Appellant's admission on the stand that he stabbed Andrews to death, the case turned on the credibility of Appellant's self-defense claim. As we have discussed at length above, the record contains sufficient evidence supporting the jury's rejection of his self-defense claim. Though the use of the term "prison shank" unnecessarily risked injecting error into the record, we conclude in light of the record as a whole that it did not affect Appellant's substantial rights and was not harmful.

## CONCLUSION

We affirm the judgment of conviction.

_____

Darlene Byrne, Chief Justice

Before Chief Justice Byrne, Justices Triana and Kelly

Affirmed

Filed: August 14, 2025

Do Not Publish

19